**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
July 30, 2012

No. 11-40316

Lyle W. Cayce
Clerk

EUGENE BLACKMON,

Plaintiff - Appellant

v.

EXIQUIO GARZA, Assistant Warden; DIANA KUKUA,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
U.S.D.C. No. 2:08-cv-273

Before KING, HIGGINBOTHAM, and HAYNES, Circuit Judges.

PER CURIAM:[*]

Plaintiff–Appellant Eugene Blackmon brought claims under 42 U.S.C. § 1983 against Warden Diana Kukua and Assistant Warden Exiquio Garza based on alleged violations of his Eighth Amendment rights while he was jailed at a Texas Department of Criminal Justice facility in Beeville, Texas. According to Blackmon, the wardens did not take constitutionally adequate measures to address the extremely high temperatures in his dormitory during the summer of 2008, exposing him to substantial health risks. Blackmon contended that he

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-40316

was particularly susceptible to the effects of the heat because, during the relevant time of his confinement, he was 63 to 64 years old and took prescription medication for pre-existing high blood pressure. The district court granted judgment as a matter of law in Defendants' favor at the close of Blackmon's case-in-chief. For the reasons stated below, we REVERSE the judgment of the district court and REMAND for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Eugene Blackmon, initially proceeding pro se, filed this action against Warden Diana Kukua, Assistant Warden Exiquio Garza, Mark Garza, Oliver Esparza, and Ramona Tucker of the Garza East Unit in Beeville, Texas, a facility operated by the Texas Department of Criminal Justice. Blackmon alleged that these defendants had turned on the heaters in the C-8 dorm during the summer of 2008. At that time, Blackmon was 63 to 64 years old and taking prescription medication for pre-existing high blood pressure. Defendants moved for summary judgment, and the magistrate judge recommended that the motion be granted. However, the district court denied the defendants' motion and appointed counsel for Blackmon.

Subsequently, the magistrate judge allowed Blackmon to file an amended complaint, in which Blackmon added defendants Captain Helen Latorre and Brad Livingston and alleged that the C-8 dorm where he was housed was extremely hot and lacked adequate ventilation, water, showers, and fans. Latorre and Livingston filed answers, and the parties filed cross-motions for summary judgment. The district court granted the defendants' summary judgment motion in part as to Livingston, Latorre, and Mark Garza; denied it in part as to Wardens Kukua and Garza in their individual capacities; denied

No. 11-40316

Blackmon's claim for injunctive relief as moot; and denied Blackmon's summary judgment motion. The remaining claims against Wardens Kukua and Garza (together, "Defendants" or "wardens") were transferred to a different judge and set for trial.

At the close of Blackmon's case-in-chief and prior to the jury reaching a verdict, the district court granted Defendants' motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The court concluded that Blackmon had not met his burden of demonstrating that Kukua and Garza were deliberately indifferent to a substantial risk of harm to Blackmon. Blackmon timely appealed.

## II. DISCUSSION

**A. Standard of Review**

This court "review[s] de novo the district court's ruling on a motion for judgment as a matter of law, applying the same legal standard as the trial court." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (citation omitted). "Judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997) (citation and internal quotation marks omitted); *see also* FED. R. CIV. P. 50(a). "[T]he court is to consider all of the evidence . . . in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury." *Id.* (citations omitted). "[J]udgment as a matter of law should only be granted if

No. 11-40316

the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Coffel v. Stryker Corp.*, 284 F.3d 625, 630 (5th Cir. 2002) (citation and internal quotation marks omitted).

## B. The Eighth Amendment

The Eighth Amendment to the Constitution of the United States prohibits the infliction of "cruel and unusual punishment." Although the Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), prison officials "must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

In a suit against a prison official for a violation of the Eighth Amendment relating to an inmate's conditions of confinement, two requirements must be met. First, the prison official's act or omission must be objectively serious, in that it "result[s] in the denial of the minimal civilized measure of life's necessities." *Id.* at 834 (citations and internal quotation marks omitted). "For a claim . . . based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* "Some conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v.*

No. 11-40316

*Seiter*, 501 U.S. 294, 304 (1991) (emphasis, citations, and internal quotation marks omitted).

Second, the "prison official must have a sufficiently culpable state of mind," meaning that the official was "deliberate[ly] indifferen[t] to inmate health or safety." *Farmer*, 511 U.S. at 834 (citations and internal quotation marks omitted). A prison official cannot be liable for deliberate indifference "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "[S]ubjective recklessness as used in the criminal law is . . . the test for 'deliberate indifference' under the Eighth Amendment." *Id.* at 839–40. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842 (internal citations omitted).

*1. The Objective Risks to Blackmon's Health*

Blackmon claims that the extreme heat he was exposed to while confined in the C-8 dorm of the Garza East Unit, combined with prison officials' inadequate measures to address it, violated his Eighth Amendment rights. Allowing a prisoner to be exposed to extreme temperatures can constitute a violation of the Eighth Amendment. *See, e.g.*, *Wilson*, 501 U.S. at 304; *Smith v. Sullivan*, 553 F.2d 373, 381 (5th Cir. 1977) ("If the proof shows the occurrence of extremes of temperature that are likely to be injurious to inmates' health[,] relief should be granted . . . ."). In *Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004),

5

No. 11-40316

this court held that an injunction requiring prison officials in the Mississippi Department of Corrections "to provide fans, ice water, and daily showers when the heat index is 90 degrees or above" was "justified by an Eighth Amendment violation." *Id.* at 339–40. The *Gates* court noted that "summer temperatures in the Mississippi Delta average[d] in the nineties with high humidity," and that the facility housing the inmates was largely not air conditioned. *Id.* at 334. There were industrial fans to help circulate the air, and most prisoners had personal fans. *Id.* Keeping the windows open, however, was problematic because of mosquitoes. *Id.* The district court concluded that the ventilation was inadequate to meet the minimum demands of the Eighth Amendment. *Id.* at 334. In addition, there was expert testimony that it was very likely that an inmate would die of heat stroke or some other heat-related illness because of the extreme conditions at issue. *Id.* at 339. This court affirmed the district court's conclusion that conditions "present[ed] a substantial risk of serious harm to the inmates." *Id.* at 340.

Similarly, in *Valigura v. Mendoza*, 265 F. App'x 232 (5th Cir. 2008), this court upheld the denial of prison officials' motion for summary judgment when a prisoner in the Garza East Unit—the unit at issue in the instant case—alleged that he had been subjected to "fifteen days of being confined to a bunk for 24 hours a day except to use the bathroom and to shower on occasion, . . . and temperatures above the eighties and into the hundreds." *Id.* at 235. The court also noted that Valigura "was not permitted to get up from his bunk . . . to get

No. 11-40316

a drink of water" in concluding that Valigura had "present[ed] evidence to support a finding of an Eighth Amendment violation."[1]  *Id.*

In the instant case, Blackmon set out sufficient evidence at trial to allow a reasonable jury to find that the conditions of confinement met the threshold for objective seriousness and "result[ed] in the denial of the minimal civilized measure of life's necessities."[2] *Farmer*, 511 U.S. at 834 (citation and internal quotation marks omitted).  Warden Kukua testified that the heat in South Texas was sometimes "intense."  However, temperatures were not taken or monitored inside the C-8 dorm during the time at issue.  Because of the lack of temperature records, Professor James Balsamo, Director of Environmental Health and Safety at Tulane University, used historical data from sources such as the National Oceanic and Atmospheric Association ("NOAA") to calculate the temperature and heat index in Beeville, Texas.[3]  The C-8 dorm was equipped with an air handler, which, according to Balsamo's testimony, did nothing to modify the humidity or temperature inside the dorm and simply functioned to move air in and out of the unit.  Balsamo concluded that the temperature and humidity were

---

[1] Whether Blackmon had adequate access to other cooler or air-conditioned areas of the prison, like the law library, recreation yard, or church, *see Valigura*, 265 F. App'x at 235, is disputed.

[2] Much of the evidence Defendants cite to contest Blackmon's arguments on appeal was not presented at trial, but instead appears in other portions of the record.  The determination of whether the district court properly granted judgment as a matter of law, however, turns on the evidence presented *at trial*.  *See Tharling v. City of Port Lavaca*, 329 F.3d 422, 426 (5th Cir. 2003) ("[W]e will affirm a directed verdict only if, viewing the evidence presented at trial in the light most favorable to the non-movant, there is no legally sufficient evidentiary basis for a reasonable jury to enter a contrary verdict." (citation and internal quotation marks omitted)).

[3] The heat index accounts for temperature and humidity and reflects how hot the air feels.

7

No. 11-40316

the same both inside Blackmon's dorm and outdoors. A memo dated June 18, 2008, from the prison maintenance department also indicated that the temperature inside the dorms was the same as the outside temperature.

Balsamo testified that on "a substantial number of days . . . [the] heat index . . . presented a danger to [inmates'] health because of heat conditions." According to Balsamo's testimony, he examined days between July 1 and September 15, 2008, where the heat index was 103 degrees or higher. He found that there were 51 days where temperatures in the C-8 dorm were in the range classified by NOAA as "extreme caution," "danger," or "extreme danger."[4] Of the 51 days, 11 were in the range of extreme danger. Balsamo testified that, on days in the extreme caution and, to a greater extent, the danger range, heat exhaustion was possible. Balsamo further testified that, on days in the extreme danger range, heat exhaustion was probable. Heat exhaustion is a condition that can result in sweating, mental confusion, headaches, nausea, and fatigue. Balsamo also testified that when conditions in Blackmon's dorm were in the extreme danger range, the risk of heat stroke was imminent. Heat stroke can cause organ failure and, ultimately, death. Balsamo also testified that Blackmon's age made him particularly susceptible to the effects of the heat. In addition, Blackmon was on medication for high blood pressure, which functioned as a diuretic and had the potential to make the high temperatures in the C-8 dorm even more dangerous to Blackmon than to other prisoners. This court has acknowledged that medications can impact a prisoner's ability to contend with

---

[4] According to the plaintiff's expert, these categories reflect increasing heat-related health risks. A heat index of 90 to 105 degrees Fahrenheit brings conditions within the "extreme caution" category. The "danger" range encompasses a heat index of 105 to 129 degrees. A heat index of 130 degrees or higher is in the range of "extreme danger."

8

extreme heat. *See Gates*, 376 F.3d at 334 ("[T]he medications often given to deal with various medical problems interfere with the body's ability to maintain a normal temperature.").

Although prison officials implemented several measures to combat the heat within the C-8 dorm, a reasonable jury could nonetheless conclude that such measures were inadequate to satisfy the Eighth Amendment's demands. Blackmon was confined in the C-8 dorm with 53 other men. There was no air conditioning; the inmates were not able to use personal fans because of a lack of electrical outlets; and the windows were sealed. There was one industrial fan mounted roughly ten feet off the floor, as well as an air handler, as mentioned above. Blackmon testified that the C-8 dorm did not have a water fountain, but Warden Kukua testified that prison officials provided cool water in the dorms, with ice water being delivered at least three times a day. Nonetheless, Blackmon testified that inmates were forced to drink from "filthy" sinks in the dormitory because prison officials did not supply a sufficient amount of water. Prisoners were allowed to take extra showers, but Blackmon testified that on hot days, when extra showers were needed the most, he had to wait roughly an hour to use the shower because two of the four showers were broken.

Defendants contend that they took appropriate measures to counteract the heat and assert that, during the summer of 2008, they were implementing all the remedial measures required by the *Gates* court. *See id.* at 339–40 (upholding an injunction requiring the provision of iced water, fans, and extra showers). However, the ventilation in the prison at issue in *Gates* was different than that in the C-8 dorm. Although the C-8 dorm had an air handler and the prison in *Gates* did not, the windows in the prison at issue in *Gates* could be opened to

No. 11-40316

alleviate the heat.[5] *Id.* at 334. In addition, unlike the prisoners in the C-8 dorm, most prisoners in *Gates* had personal fans. *Id.* Further, Blackmon's testimony regarding the need to drink from the sinks in his dormitory raises questions regarding whether prison officials provided cool water in sufficient amounts.

Thus, despite the existence of some parallels between the remedial measures in place in the instant case and those required in *Gates*, the conditions in *Gates* were not identical to those in Blackmon's dorm. Further, Blackmon's testimony regarding the provision of water created a fact issue regarding whether the remedial measures required by the *Gates* court were fully implemented with respect to the C-8 dorm. Moreover, the instant case pertains to the heat-related health risks to a single prisoner who was 63 to 64 years old, had pre-existing high blood pressure, and was taking medication that could have interfered with his body's ability to dissipate heat. Consequently, even though we conclude that the evidence presented at trial could potentially support a verdict in Blackmon's favor, we do not suggest that the remedial measures required by the *Gates* court are insufficient to address the risks of high heat and humidity, particularly with regard to prisoners who are younger and healthier than Blackmon.[6]

Furthermore, despite the remedial measures implemented by prison officials, there was evidence presented at trial that the heat in the C-8 dorm

---

[5] An influx of mosquitoes initially made opening the windows problematic, but the *Gates* court upheld the portion of the injunction requiring the installation of screens with an appropriate gauge to keep mosquitoes out. *Gates*, 376 F.3d at 334, 340.

[6] We also note that, like the *Gates* court, we do not suggest that air conditioning is mandatory to meet the requirements of the Eighth Amendment.

adversely affected Blackmon's health. Blackmon testified that he suffered from headaches and dizziness almost constantly. He also testified that he was often light headed and nauseated. According to Blackmon's testimony, his vision frequently blurred and dimmed, and he often had difficulty catching his breath. In addition, he testified that the heat aggravated his pre-existing high blood pressure. This testimony, if credited by the jury, would further support the conclusion that Blackmon was exposed to serious health risks while incarcerated in the C-8 dorm.

In sum, when viewed in the light most favorable to Blackmon, the evidence presented at trial would allow a reasonable jury to conclude that the extreme heat in Blackmon's dorm caused substantial health risks to Blackmon—a prisoner who, according to testimony presented at trial, was especially susceptible to the health risks of extreme heat because of his advanced age, pre-existing high blood pressure, and use of prescription medication. Further, with respect to a prisoner such as Blackmon, a jury could reasonably conclude that the remedial measures adopted by prison officials were inadequate to combat the extreme conditions in the C-8 dorm and to address the salient health risks. Thus, the evidence was not so overwhelmingly in Defendants' favor that a reasonable jury could not have concluded that Blackmon satisfied his burden of proof with regard to the objective prong of the Eighth Amendment analysis.

*2. The Defendants' States of Mind*

We also conclude that the evidence presented at trial, when viewed in the light most favorable to Blackmon, was sufficient to allow a jury to conclude that Defendants were deliberately indifferent to significant risks to Blackmon's health. Defendants argue that there was no direct evidence that they had actual

knowledge of any risks to Blackmon. They note that prison doctors did not impose any housing or work restrictions on Blackmon based on his age or health. Further, Defendants contend that Blackmon failed to bring any heat-related health problems to their attention and that blood pressure readings in Blackmon's medical records reflect that his high blood pressure was not aggravated by the heat. They also highlight Warden Kukua's testimony that there was no record of any prisoners being diagnosed with heat-related illnesses between March and September 2008.

However, Blackmon testified that, prior to filing this lawsuit, he filed numerous grievances complaining about the heat, its effect on his health, and prison officials' failure to address his concerns. Warden Kukua testified that she did not recall seeing Blackmon's grievances, but that Assistant Warden Garza would have reviewed them. Blackmon further testified that on June 18, 2008, in response to a grievance Blackmon had filed, a prison maintenance worker and Assistant Warden Garza took measurements in the dorm and found that the temperature was 108 degrees and the heat index was 115 degrees, suggesting that, at a minimum, Garza was aware of the high temperatures in the C-8 dorm. Also, as discussed above, a memorandum dated June 18, 2008, which was sent to all prisoners by prison maintenance, indicated that the temperature in the C-8 dorm was the same as the temperature outdoors. Warden Kukua denied seeing the memorandum, but she testified that she should have been aware of it. In addition, Blackmon testified that he visited the prison infirmary on numerous occasions and complained of the heat's adverse effects on his health. According to Blackmon, his blood pressure was very high during these visits, but the clinic staff refused to document his blood-pressure readings or health

complaints.[7]   Based on the evidence described above, we conclude that the evidence presented at trial would allow a reasonable jury to find that Defendants knew of the risks to Blackmon's health.

In addition to the evidence suggesting Defendants had specific knowledge of the risks to Blackmon, a jury could reasonably conclude that the heat-related health risks to Blackmon were obvious.  *See Farmer*, 511 U.S. at 842 (stating that the fact that a risk is obvious supports the conclusion that a prison official was aware of the risk).  As discussed above, Kukua testified that she was aware that the summer heat was "intense."  Moreover, the evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners.  The training highlighted the particular risks to prisoners such as Blackmon—an older inmate taking medications with a diuretic effect.  Thus, the obvious nature of the risks to Blackmon would further support a jury finding that Defendants were deliberately indifferent to the risks to Blackmon's health.  *See Gates*, 376 F.3d at 340 ("[B]ased on the open and obvious nature of these [exceedingly hot] conditions [in the prison] and the evidence that inmates had complained of symptoms of heat-related illness, the trial court's finding regarding MDOC's deliberate indifference is not clearly erroneous.").

---

[7] Dr. Charles Adams offered conflicting testimony, indicating that Blackmon did not complain of heat-related problems and that Blackmon was not diagnosed with a heat-related illness.  Dr. Adams further testified that Blackmon's blood pressure actually improved during the summer months of 2008 in comparison to the previous winter.  However, in reviewing the district court's grant of judgment as a matter of law, we resolve all credibility determinations in the non-movant's favor.  *See Porter v. Epps*, 659 F.3d 440, 444–45 (5th Cir. 2011).

*3. Injury to Blackmon*

Blackmon argues that the district court erred by requiring him to prove that he suffered a significant physical heat-related injury to maintain his claims. It is unclear that the district court required such a showing, but after concluding that Blackmon had not established that the wardens were deliberately indifferent to risks to Blackmon's health, the court stated:

> Furthermore, the evidence in [Blackmon's] case-in-chief fell short of establishing by a preponderance of the evidence that the alleged acts or omissions on the part of the Defendants had proximately caused any significant physical injury. Although the Plaintiff contended that his exposure to excessive heat aggravated his preexisting condition of hypertension, his medical records contained actual blood pressure readings taken between May 2008 and August 2008, and those readings did not indicate any significant increase in his blood pressure.

Blackmon contends that, in light of *Wilkins v. Gaddy*, 130 S. Ct. 1175 (2010), he was not required to establish that he suffered even a *de minimis* physical injury. He notes that, in the context of a claim of excessive force, the Supreme Court stated that "contemporary standards of decency" can be violated "whether or not significant injury is evident." *Id.* at 1178 (citations and internal quotation marks omitted).

This court has previously required a showing of more than a *de minimis* physical injury to sustain a claim predicated on a violation of Eighth Amendment rights. *See, e.g.*, *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir. 1995) (affirming the district court's grant of summary judgment where the plaintiff "ha[d] failed to present medical evidence of any significance"); *Johnson v. Tex. Bd. of Criminal Justice*, 281 F. App'x 319, 321 (5th Cir. 2008) ("While Johnson alleged that the temperatures were sometimes uncomfortably hot, he did not

No. 11-40316

allege that he suffered from any heat-related injuries . . . ."). However, this court has yet to address the potential impact of *Wilkins* on cases pertaining to conditions of confinement.   Nonetheless, because the physical symptoms Blackmon described in his testimony at trial (i.e., headaches, nausea, shortness of breath, and blurred and dimmed vision) would constitute more than a *de minimis* physical injury, it is unnecessary to determine whether Blackmon must show more than a *de minimis* injury to sustain his claims.   *See Brown v. Lippard*, 472 F.3d 384, 386 (5th Cir. 2006) (suggesting that knee, hand, and shoulder pain, accompanied by several one-centimeter abrasions, would exceed a *de minimis* threshold).   Thus, to the extent that the district court based its grant of judgment as a matter of law on Blackmon's failure to prove he suffered a significant physical injury, the district court erred.

### III. CONCLUSION

Viewing the evidence set out at trial in the light most favorable to Blackmon, we conclude that the evidence did not militate so strongly in Defendants' favor that a reasonable jury could not have reached a verdict in Blackmon's favor.  Consequently, the district court erred by granting judgment as a matter of law in favor of Defendants.  Thus, we REVERSE the judgment of the district court and REMAND the case for a new trial.