JENNIFER WALKER ELROD, Circuit Judge:
In this interlocutory appeal, Brad Livingston, Rick Thaler, and William Stephens (collectively “Defendants”) challenge an order of the district court that deferred ruling on their motion to dismiss on the basis of qualified immunity and ordered limited discovery. Because the district court correctly concluded that the complaint was sufficient and that further factual development was needed to rule on Defendants’ qualified immunity defense, and because the discovery that the district court ordered was narrowly tailored to the facts needed to rule on the defense, we lack jurisdiction over this appeal and dismiss.
I.
On August 29, 2012, Albert Hinojosa died of complications from heatstroke while he was incarcerated at the Garza West Unit of the Texas Department of Criminal Justice (“TDCJ”).[1] Shortly after midnight, an inmate reported that Hinojo-sa had fallen out of his bed and was convulsing. A correctional officer found Hino-josa on the floor of his cell. He was unresponsive, and his skin was hot to the touch. The officer’s supervisor called for an ambulance, but Hinojosa was pronounced dead twenty minutes after it arrived. An autopsy concluded that he “was vulnerable to the effects of environmental hyperthermia due to pre-existing natural disease, and likely suffered a seizure followed by fatal cardiac arrhythmia.”
Hinojosa’s mother and sole heir, Ramona Hinojosa, sued numerous prison officials and employees, the TDCJ, the University of Texas Medical Branch (“UTMB”), and an official of UTMB, alleging that they were responsible for her son’s death.[2] She asserted claims under 42 U.S.C. § 1983, the Americans with Disabilities Act of 1990 (“ADA”) and the ADA Amendments Act, 42 U.S.C. § 12131 et seq., and the Rehabilitation Act of 1973, 29 U.S.C. § 794. Only the § 1983 claim is at issue in this appeal. Hinojosa’s mother premised her § 1983 claim on an asserted Eighth Amendment violation, alleging that the conditions in which Defendants housed Hinojosa posed a substantial risk of serious harm, and that Defendants acted with deliberate indifference toward Hinojosa’s health and safety needs.
The complaint alleges that at the time of his death, Hinojosa was forty-four years old and obese, and he suffered from hypertension, diabetes, depression, and schizophrenia — conditions that made him susceptible to heat-related illnesses. According *662 to the complaint, Hinojosa took various medications for his ailments, a common side-effect of which is that they render patients more vulnerable to the heat. The complaint alleges that, as reflected in TDCJ policies, Defendants knew that these conditions and medications put affected prisoners at an increased risk of heat-related illness. Indeed, according to the complaint, from 2007 until Hinojosa’s death, thirteen other men had died from heat-related causes in TDCJ prisons. Many of these individuals allegedly suffered from ailments — and had been prescribed medications — similar to Hinojosa’s. Moreover, the complaint alleges that like many of the other deceased prisoners, Hi-nojosa had recently been moved from a climate-controlled county jail,[3] and he died shortly after his arrival at a non-air-conditioned TDCJ transfer facility before he had much time to acclimatize to the high temperatures of the new environment. The complaint alleges that TDCJ policies acknowledged the importance of acclimatization to reduce the risk of heatstroke, but TDCJ did not have any housing assignment policy for newly arrived inmates to help them acclimatize.
According to the complaint, although certain parts of the Garza West Unit have air conditioning, those portions used to house inmates do not, and the Unit’s windows are sealed shut. The complaint alleges that summer temperatures inside the Unit routinely exceed 90°F, and even 100°F. The complaint specifically alleges that the day before Hinojosa died, the temperature at the Unit surpassed 100°F, and in twenty-seven of the twenty-eight days preceding his death, the temperature rose above 95°F. According to the complaint, while TDCJ policies dictate that inmates with heat-sensitive conditions not work or recreate in environments where the apparent air temperature is 95°F or higher, they do not address housing assignments for such inmates. In addition, according to the complaint, inmates sometimes wait up to ten days to receive then-intake physical examination after then-transfer to TDCJ custody. These physicals provide the first opportunity to detect and treat inmates’ heat-sensitive medical problems, and the complaint alleges that TDCJ will not allow newly arrived inmates to labor outdoors until they have received an intake physical. But what is true for work is not true for housing, the complaint asserts. According to the complaint, before they receive their intake physicals, newly arrived inmates may not labor outdoors in high temperatures, but they are nonetheless housed in high indoor temperatures along with the rest of the inmate population.
The complaint alleges that despite then-awareness of numerous prior heat-related fatalities, Defendants took no corrective action. Under policies that Defendants allegedly implemented and could have changed, no housing accommodation was made for newly arrived inmates or inmates with heat-sensitive medical conditions. The complaint asserts that Thaler and Stephens routinely reviewed reports of heat-related injuries and deaths and regularly discussed those incidents in meetings with their deputies. According to the complaint, however, they made no changes to inmates’ accommodations, failed to ensure that inmates timely received intake physicals, and failed to implement any other protective procedures. Livingston also took no action, the complaint alleges, even though he approved cooling measures for barns housing pigs that TDCJ raises for slaughter. The complaint also alleges that *663 Livingston took part in the decision not to employ medical staff at the Garza West Unit during night hours, and that all three supervisory Defendants were responsible for an alleged lack of adequate training that correctional officers received.
II.
Defendants moved to dismiss the § 1983 claim against them on the basis of qualified immunity. They argued that as the top three security administrators of TDCJ,[4] they were not personally responsible for— and did not personally participate in — any decisions regarding Hinojosa’s housing or medical needs, and they did not violate clearly established law.
After hearing argument on the motion, the district court orally denied it from the bench. In its later-issued written order explaining its reasoning, the district court held that the complaint alleged facts which, if true, would permit the inference that the defendants were liable for the alleged harm and would defeat the qualified immunity defense. However, the district court determined that further factual development was necessary for it to rule on the defense, because “[tjhere remain significant questions to be answered as to the details of the TDCJ Defendants’ knowledge, actions, omissions and/or policies in regards to TDCJ prison operations in times of extreme heat.” Therefore, the district court deferred ruling on the qualified immunity defense and ordered discovery “limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death.” Defendants then initiated this interlocutory appeal.
III.
The parties disagree over whether we have jurisdiction to review the district court’s order. Under 28 U.S.C. § 1291, we have jurisdiction to review “final decisions” of the district courts in our circuit. Generally, this class of decisions “does not include discovery orders.” Backe v. LeBlanc, 691 F.3d 645, 647-48 (5th Cir.2012). However, the Supreme Court has interpreted § 1291 to include a grant of authority to review a “small class” of collateral orders traditionally considered non-final. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 545-47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). Under this collateral order doctrine, we have jurisdiction under § 1291 to entertain appeals from decisions that “[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] [are] effectively unreviewable on appeal from a final judgment.” Texas v. Caremark, Inc., 584 F.3d 655, 657-58 (5th Cir.2009) (alterations in original) (quoting Will v. Hallock, 546 U.S. 345, 349, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006)). A district court’s order denying qualified immunity is one such order. Zapata v. Melson, 750 F.3d 481, 484 (5th Cir.2014); Backe, 691 F.3d at 648. So too is an order deferring the district court’s qualified immunity ruling and providing for limited discovery if the order fails to comply with our precedent, because “[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery.” Backe, 691 F.3d at *664 648. If, however, such an order complies with our precedent, we lack jurisdiction to review it. Zapata, 750 F.3d at 485; Backe, 691 F.3d at 648.
Thus, to determine whether we have jurisdiction over this interlocutory appeal, we must determine whether the district court’s order complied with our precedent for issuing such orders. “[T]his court has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense.” Backe, 691 F.3d at 648. First, the district court must determine “that the plaintiffs pleadings assert facts which, if true, would overcome the defense of qualified immunity.” Id. (quoting Wicks v. Miss. State Emp’t Servs., 41 F.3d 991, 994 (5th Cir.1995)). “Thus, a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity.” Id. When reviewing a complaint that meets this standard, the district court may defer its qualified immunity ruling and order limited discovery if “the court remains ‘unable to rule on the immunity defense without further clarification of the facts.’ ” Id. (quoting Lion Boulos v. Wilson, 834 F.2d 504, 507 (5th Cir. 1987)). Such a discovery order must be “narrowly tailored to uncover only those facts needed to rule on the immunity claim.” Id. (quoting Lion Boulos, 834 F.2d at 507-08). “[W]e may review the order under the collateral order doctrine when a district court fails to find first that the plaintiffs complaint overcomes a defendant’s qualified immunity defense, when the court refuses to rule on a qualified immunity defense, or when the court’s discovery order exceeds the requisite ‘narrowly tailored’ scope.” Id. (internal citations omitted); see also Zapata, 750 F.3d at 485.
IV.
A.
We first ask whether the complaint pleads facts that, if true, would permit the inference that Defendants are liable under § 1983 for an Eighth Amendment violation and would overcome their qualified immunity defense. We conclude that it does.
i.
The Eighth Amendment to the United States Constitution prohibits the infliction of “cruel and unusual punishments.” U.S. Const.amend. VIII. This prohibition, made applicable to the States through the Fourteenth Amendment,[5] see *665 Robinson v. California, 370 U.S. 660, 666-67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), “does not mandate comfortable prisons, but neither does it permit inhumane ones.” Ball v. LeBlanc, 792 F.3d 584, 592 (5th Cir.2015) (quoting Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). To plead an Eighth Amendment violation based on the conditions of an inmate’s confinement, a plaintiff must allege conditions that “pos[e] a substantial risk of serious harm.” Farmer, 511 U.S. at 834, 114 S.Ct. 1970. The plaintiff must also allege that the defendant prison officials were deliberately indifferent to the inmate’s health or safety. Id. This requires more than an allegation of mere negligence, but less than an allegation of purpose or knowledge. Id. at 835-36, 114 S.Ct. 1970. Rather, a prison official acts with deliberate indifference when he “knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Id. at 837, 114 S.Ct. 1970.
Whether a risk is substantial and the threatened harm is serious represents an objective test; whether prison officials consciously disregarded the risk represents a subjective one. Ball, 792 F.3d at 592. Furthermore, “[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.” Farmer, 511 U.S. at 842, 114 S.Ct. 1970 (internal citation omitted). For instance, “if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus ‘must have known’ about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.” Id. at 842-43, 114 S.Ct. 1970 (internal quotation marks omitted).
We have held that exposing an inmate to extreme cell temperatures can constitute cruel and unusual punishment. See, e.g., Ball, 792 F.3d at 592; Gates v. Cook, 376 F.3d 323, 339-40 (5th Cir.2004); Blackmon v. Garza, 484 Fed.Appx. 866, 869 (5th Cir.2012); see also Smith v. Sullivan, 553 F.2d 373, 381 (5th Cir.1977) (noting that the Eighth Amendment is implicated by “extremes of temperature that are likely to be injurious to inmates’ health”). In Gates, we affirmed an injunction requiring state prison officials to provide ice water, fans, and daily showers when the heat index was 90°F or above. 376 F.3d at 339-40. The evidence in Gates showed that “summer temperatures ... average[d] in the nineties with high humidity,” ventilation measures were inadequate to afford relief from the heat, “[t]he probability of heat-related illness [was] extreme,” and inmates taking certain medications were especially susceptible to the heat. Id. at 334. In holding that the district court had properly identified an Eighth Amendment violation, we noted that an expert had testified that heat-related deaths were “very likely,” and *666 that a finding of deliberate indifference was justified “based on the open and obvious nature of these conditions and the evidence that inmates had complained of symptoms of heat-related illness.” Id. at 339-40.
Similarly, in Blackmon, we held that prison officials were not entitled to judgment as a matter of law where the evidence showed extreme temperatures in the facility, the plaintiff inmate was particularly susceptible to heat-related injury because of his age and medication, and the prison officials were aware of the danger but took arguably inadequate remedial measures. 484 Fed.Appx. at 870-73. Most recently, in Ball, we held that an injunction requiring heat-reduction measures was supported by an Eighth Amendment violation where an expert testified that the plaintiff inmates were particularly susceptible to the heat because of their medical conditions and treatments, and the evidence showed that during a monitoring period, the heat index at the facility ranged from 81.5°F to 107.79°F, with temperatures ranging from 78.26°F to 92.66°F. 792 F.3d at 596. Prison officials had violated the Eighth Amendment even though they argued that no inmate at the subject facility “ha[d] ever suffered a heat-related incident” and the plaintiffs’ “medical records showfed] no signs of heat-related illness.” Id. at 593. This is because, “[t]o prove unconstitutional prison conditions, inmates need not show that death or serious injury has already occurred. They need only show that there is a substantial risk of serious harm.” Id. (internal quotation marks and citation omitted).
ii.
Here, the complaint alleges an Eighth Amendment violation. The complaint alleges that Defendants subjected Hinojosa to dangerous heat conditions in conscious disregard of the serious risk that the heat posed for prisoners who, like Hinojosa, suffered from certain medical conditions, took certain medications, and had recently been transferred from air-conditioned jails to non-climate-controlled facilities. As to conditions posing a substantial risk of serious harm, the complaint alleges that temperatures in the Garza West Unit routinely exceeded 90°F, and even 100°F, and that Defendants’ policies subjected inmates to these dangerous temperatures. It asserts that Hinojosa died in his cell in the early morning due to complications following a heatstroke, and that the temperature had risen above 100°F during the previous day. The complaint also alleges that inmates are provided “grossly inadequate amounts of water” to cope with the heat. These allegations plainly suffice to set forth conditions constituting a substantial risk of serious harm to inmates with medical conditions and prescriptions like Hinojosa’s. See Ball, 792 F.3d at 594; Gates, 376 F.3d at 339-40; Blackmon, 484 Fed.Appx. at 870-71.
Moreover, to support its claim that Defendants were aware of the heat risk and consciously disregarded it, the complaint alleges that from 2007 until Hinojosa’s death, thirteen other men had died from heat-related causes in TDCJ prisons under similar circumstances, and TDCJ had previously been sued by inmates complaining of the heat.[6] Ten of these thirteen deaths *667 occurred in 2011, the year before Hinojo-sa’s. Furthermore, the complaint alleges that Defendants took no action despite their knowledge of these deaths, of the extreme temperatures in TDCJ facilities, of the vulnerability of recently transferred inmates with conditions and medications similar to Hinojosa’s, and of the importance of timely intake physicals. It also alleges that TDCJ policies themselves recognized the risk of heat to inmates like Hinojosa, and Defendants provided training (albeit inadequate training) regarding extreme temperatures, suggesting their awareness of the risk.
The complaint specifically asserts that Thaler and Stephens routinely reviewed reports of heat-related injuries and deaths, discussing them in meetings with their deputies. According to the complaint, while Thaler and Stephens maintain that they remind regional directors and wardens to take heat-safety precautions, Thaler and Stephens in fact do no such thing. The complaint also asserts that Livingston personally approved cooling measures to protect the swine that TDCJ raises for slaughter, and Plaintiff argues that this allegation shows that Livingston was aware of the heat risk to inmates. The complaint also describes a letter that a state representative sent to Livingston, expressing concern about the high temperatures and asking that TDCJ take preventative measures.
These allegations, if true, would establish that Defendants were “aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... also dr[ew] the inference.” Farmer, 511 U.S. at 837, 114 S.Ct. 1970; see also id. at 842-43, 114 S.Ct. 1970 (observing that deliberate indifference can be inferred merely from the obviousness of the risk, such as when prior incidents are pervasive or well-documented and circumstances suggest that the defendant was aware of them); cf. also Ball, 792 F.3d at 594-95 (holding that the defendants were aware of the risk posed by high temperatures even though they argued no inmate had ever suffered a heat-related incident at the subject facility). In any event, the open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference. See Gates, 376 F.3d at 340.
Defendants argue that the complaint fails to plead deliberate indifference because it does not allege that they were aware of Hinojosa’s specific medical history and needs. However, their lack of knowledge of Hinojosa’s individual susceptibility to heat-related dangers cannot defeat an Eighth Amendment claim. The complaint alleges that Defendants were aware of the risk to recently transferred inmates with conditions and medications like Hinojosa’s and yet took no action. Prison officials cannot escape liability in a conditions-of-confinement case like this one by arguing that, while they allegedly were aware of and consciously disregarded a substantial risk of serious harm to a discrete class of vulnerable inmates, they were not aware that the particular inmate involved in the case belonged to that class. See Farmer, 511 U.S. at 843, 114 S.Ct. 1970 (in a case alleging prison conditions that created a risk of violence, holding that “it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a *668 risk”) (emphasis added); id. at 844, 114 S.Ct. 1970 (observing that where prison violence is widespread, “it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom”); Helling v. McKinney, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (noting that the Eighth Amendment is implicated — and § 1983 liability may be triggered — when prison officials allow inmates to be exposed to infectious disease, “even though the possible infection might not affect all of those exposed”). Furthermore, even assuming ar-guendo that Defendants’ ignorance of Hi-nojosa’s medical history could be relevant, the complaint alleges dangerous conditions that we have previously held to be unconstitutional for general inmate populations. See Gates, 376 F.3d at 339-40.
In sum, then, the complaint adequately alleges an Eighth Amendment violation based on Hinojosa’s conditions of confinement. Nevertheless, Defendants contend that the complaint does not properly allege their responsibility for the asserted constitutional violation because § 1983 does not contemplate supervisory liability. They argue that they cannot be held liable for the alleged failures of medical personnel and subordinate corrections officers because they did not personally participate in those failures.
The premise of Defendants’ argu- • ment is undoubtedly correct. In Monell v. Department of Social Services, the Supreme Court held that claims against local governments premised on a theory of respondeat superior liability are not cognizable under § 1983. 436 U.S. 658, 691-94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Relying on Monell, “we have held that supervisory officials may not be found vicariously liable for the actions of their subordinates under § 1983.” Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 452 (5th Cir.1994) (en banc); see also Thompson v. Steele, 709 F.2d 381, 382 (5th Cir.1983) (citing Monell for the proposition that “ § 1983 does not give a cause of action based on the conduct of subordinates,” and observing that “[personal involvement is an essential element of a civil rights cause of action”). Indeed, the Supreme Court squarely held in Ashcroft v. Iqbal that § 1983 claims against supervisory officials cannot be premised merely upon their knowledge of subordinates’ actions. 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Instead, under § 1983, “each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.” Id.
But Defendants misread the complaint. The complaint does not seek to hold Defendants vicariously liable for the actions of their subordinates. Rather, it seeks to hold them liable for their own actions in promulgating — and failing to correct — intake and housing policies that exposed Hinojosa and other inmates like him to extreme temperatures without adequate remedial measures. “A supervisory official may be held liable ... if ... he implements unconstitutional policies that causally result in the constitutional injury.” Porter v. Epps, 659 F.3d 440, 446 (5th Cir.2011) (internal quotation marks omitted). To the extent that Defendants appear to argue they had no hand in the formation of the intake and housing policies described in the complaint, they raise a factual dispute inappropriate for resolution on a motion to dismiss. The complaint specifically alleges that Defendants promulgated and had the power to change the policies that allegedly caused Hinojosa’s death. Moreover, while it is true that the complaint contains allegations regarding the conduct of Defendants’ subordinates, these allegations seek only to establish direct liability against *669 those subordinates who were also named as defendants in the complaint, not vicarious liability against Livingston, Thaler, and Stephens.
iii.
The complaint alleges facts that, if true, not only would establish Defendants’ liability for an Eighth Amendment violation, but also would be sufficient to overcome a qualified immunity defense. “A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiffs constitutional rights and (2) the defendant’s actions were objectively unreasonable in light of clearly established law at the time of the violation.” Porter, 659 F.3d at 445. “A Government official’s conduct violates clearly established law when, at the time of the challenged conduct, ‘[t]he contours of [a] right [are] sufficiently clear’ that every ‘reasonable official would have understood that what he is doing violates that right.’ ” Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Our precedent clearly establishes that the Eighth Amendment guarantees inmates a right to be free from exposure to extremely dangerous temperatures without adequate remedial measures. See, e.g., Gates, 376 F.3d at 339-40; Blackmon, 484 Fed.Appx. at 869; see also Smith, 553 F.2d at 381. In light of this precedent, a prison official acts unreasonably when he, either directly or through his policy, subjects an inmate to extremely dangerous temperatures without adequate remedial, measures in conscious disregard of the risk posed by those temperatures.
Defendants argue, however, that the complaint cannot surmount the qualified immunity hurdle because there is no clearly established right to an air-conditioned cell or to around-the-clock medical care. Defendants’ argument again misreads the complaint and confuses right with remedy. While the complaint does allege that TDCJ cells are not air-conditioned and that TDCJ fails to employ medical staff during nighttime hours, it does not claim that the Eighth Amendment requires such accommodations. Rather, the right that it asserts is the right to be free from exposure to extremely dangerous temperatures without adequate remedial measures. The complaint’s description of the lack of remedial measures does not purport to be an exhaustive list of the Eighth Amendment’s basic requirements.' It is simply a description of several ways in which Defendants could have addressed the risk, but instead chose not to do so. The right that it asserts, however, is the well-established Eighth Amendment right not to be subjected to extremely dangerous temperatures without adequate ameliorative measures.
Defendants also contend that the Supreme Court’s recent decision in Taylor v. Barkes, — U.S. -, 135 S.Ct. 2042, 192 L.Ed.2d 78 (2015), bolsters their qualified immunity argument. It does not. In Barkes, survivors of an inmate who committed suicide brought suit against, inter alia, the commissioner of the Delaware Department of Corrections and the institution’s warden. Id. at 2043. When the inmate had arrived at the facility, a nurse administered an intake mental health evaluation, which revealed only two out of seventeen possible suicide risk factors. Id. Following established protocol, the nurse gave the inmate a routine referral to mental health services but did not activate any special suicide-prevention measures. Id. The inmate was placed alone in a cell and hanged himself the next day. Id. The plaintiffs claimed that the commissioner and warden violated the inmate’s Eighth *670 Amendment right “by failing to supervise and monitor the private contractor that provided the medical treatment — including the intake screening — at the Institution.” Id. The Supreme Court held that the defendants were entitled to qualified immunity because no decision of the Court “even discusses suicide screening or prevention protocols,” the Third Circuit’s own case law did not clearly recognize such a right, and other circuits had generally “suggested that such a right did not exist.” Id. at 2044-45. In sum, the Court found, even if the alleged shortcomings existed, “no precedent on the books ... would have made clear to petitioners that they were overseeing a system that violated the Constitution.” Id. at 2045.
Here, by contrast, assuming Hinojosa’s allegations to be true, our precedent put Defendants on notice that they were “overseeing a system that violated the Constitution.” Id. Our circuit has made very clear that inmates have a right, under the Eighth Amendment, not to be subjected to extreme temperatures without adequate remedial measures, and Defendants have not alerted us to any contrary authority. See, e.g., Gates, 376 F.3d at 339-40; see also Smith, 553 F.2d at 381; Blackmon, 484 Fed.Appx. at 869. While we have not had occasion to give an exhaustive fist of acceptable remedial measures, we have held that the provision of fans, ice water, and daily showers can suffice. See Gates, 376 F.3d at 339-40; see also Ball, 792 F.3d at 599 (approving remedies short of full air-conditioning such as the diversion of cool air from prison staff areas into inmate areas, allowing inmates to access air conditioning during specified times, and the provision of cool daily showers, cold ice water, personal ice containers, and individual fans).
A reasonable prison official in our circuit knows that during times of extreme heat, he must afford these remedies — or remedies like them — to satisfactorily address the risk of heat-related illnesses and fatalities. However, the complaint alleges that TDCJ did not provide enough drinking water or personal fans during times of extreme heat, and that the water that was provided was only lukewarm. The complaint also alleges that Defendants knew that prisoners such as Hinojosa were particularly vulnerable to the heat, and that through the intake and housing policies that they promulgated, they failed to ensure that such prisoners received any meaningful relief. If true, this would defeat a qualified immunity defense, because it would establish that Defendants subjected Hinojosa to extreme temperatures without adequate remedial measures, in violation of our circuit’s clearly established law.
B.
Having determined that the complaint’s factual allegations, if true, would establish Defendants’ liability for an Eighth Amendment violation and overcome a qualified immunity defense, we next ask whether further clarification of the facts was necessary for the district court to rule on the qualified immunity defense. We easily conclude that it was.
When reviewing a well-pleaded complaint and a defendant’s motion to dismiss on the basis of qualified immunity, a district court may defer its qualified immunity ruling and order limited discovery when “the court remains ‘unable to rule on the immunity defense without further clarification of the facts.’ ” Backe, 691 F.3d at 648 (quoting Lion Boulos, 834 F.2d at 507). In other words, a district court may elect the defer-and-discover approach “when the defendant’s immunity claim turns at least partially on a factual question” that must be answered before a ruling can issue. Lion Boulos, 834 F.2d at 507.
*671 Here, the district court held that it was unable to rule on Defendants’ qualified immunity claim because factual development was needed as to their “knowledge, actions, omissions and/or policies in regards to TDCJ prison operations in times of extreme heat.” In particular, the district court concluded that:
[I]t is necessary to know when and how the TDCJ Defendants learned about specific prisoner deaths, including the death of Albert Hinojosa, and/or serious injury related to extreme heat; whether the TDCJ Defendants ordered that conditions be monitored or a study conducted regarding extreme heat and inmate safety; their familiarity with Fifth Circuit case law addressing the dangers of heat within the context of the Eighth Amendment and whether or not policies were implemented or changed in accordance with such direction; whether the TDCJ has performed any studies into the costs of reducing extreme temperatures within the dorms via more efficient systems, engineering modifications, or other facility upgrades; whether the TDCJ Defendants personally consulted with UTMB officials in regards to the transportation and housing of at-risk inmates during the summer months; whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport; and whether the TDCJ Defendants received copies of notes, memo-randa, emails, or other correspondence from TDCJ wardens concerning heat-related issues at their units and any administrative responses thereto.
The district court considered these factual issues to be “particularly important when evaluating the second prong of the qualified immunity test — the reasonableness of the TDCJ Defendants’ actions in light of the clearly established constitutional right to be free from extreme temperatures.”
The factual questions of what Defendants knew, when they knew it, and whether they investigated and considered possible remedial measures, are undoubtedly necessary to answer before determining whether Defendants acted reasonably in light of clearly established law. Of course, as detailed above, Defendants’ knowledge is central to the deliberate indifference element of Plaintiffs Eighth Amendment claim. However, their knowledge is also highly relevant to qualified immunity, because it bears heavily on the reasonableness of their actions.
As we recently observed in a similar interlocutory appeal from a district court’s discovery order, the qualified immunity inquiry requires the district court to “evaluate whether [the defendants] acted with deliberate indifference by subjectively disregarding a known risk, and whether [their] actions were objectively reasonable despite the alleged deliberate indifference.” Webb v. Livingston, 618 Fed.Appx. 201, 210 (5th Cir.2015) (unpublished) (internal citation omitted) (holding that a district court’s defer-and-discover order in a similar wrongful death case against Livingston, Thaler, and Stephens complied with our precedent for issuing such orders, and dismissing for lack of jurisdiction). Furthermore, Defendants’ “subjective knowledge is a question of fact, which this court has recognized is peculiarly within [their] knowledge and possession.” Id. (internal quotation marks omitted); see also Gates, 376 F.3d at 333 (“Whether a prison official had the requisite knowledge of a substantial risk is a question of fact....”); Schultea v. Wood, 47 F.3d 1427, 1431 (5th Cir.1995) (recognizing that the establishment of qualified immunity “depend[s] on facts peculiarly within the knowledge and control of the defendant” (quoting Gomez v. Toledo, 446 U.S. 635, 641, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980))).
*672 The qualified immunity defense requires the district court to determine whether Defendants acted reasonably at the time of the alleged constitutional violation, and “[t]his determination is complicated when, as here, the deliberate indifference standard must be reconciled with the second prong’s objective reasonableness standard.” Webb, 618 Fed.Appx. at 210. The reasonableness analysis must be different from the deliberate-indifference analysis, because “[o]therwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine.” Id. (quoting Hare v. City of Corinth, 135 F.3d 320, 328 (5th Cir.1998)). “In light of these complexities, we have observed that ‘[additional facts ... are particularly important when evaluating the [reasonableness] prong of the qualified immunity test.’ ” Id. (quoting Morgan v. Hubert, 335 Fed.Appx. 466, 473 (5th Cir.2009)). That holds true in this case. The district court did not err in determining that factual development was needed to rule on Defendants’ qualified immunity defense.
C.
Our foregoing discussion establishes that the district court was empowered to defer its qualified immunity ruling and issue a discovery order. However, the breadth of the ordered discovery is ■ critically important. Qualified immunity is immunity not only from judgment, but also from suit; “[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery.” Backe, 691 F.3d at 648. We therefore must determine whether the discovery that the district court ordered was “narrowly tailored to uncover only those facts needed to rule on the immunity claim.” Id. (quoting Lion Boulos, 834 F.2d at 507-08). While this presents a somewhat close question, we conclude that the district court’s discovery order was appropriately tailored.
The district court ordered discovery “limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death.” The district court elaborated that:
Such discovery may include Defendants’ knowledge of extreme temperatures at the Garza West Unit, including knowledge of any prisoner complaints to prison officials about the temperature in the dorms or cells for the months of May through September for the years of 2010, 2011, and 2012. Plaintiff may inquire as to each Defendant’s personal knowledge, if any, in regards to the effects of extreme heat on pre-existing medical conditions of hypertension, diabetes, depression, and schizophrenia, whether Defendants are familiar with the medications generally prescribed to treat such conditions, and whether Defendants have knowledge or training concerning medications and extreme heat. Plaintiff may inquire as to any policies and procedures in place at the Garza West Unit, as well as TDCJ system-wide policies or procedures, adopted or in place to address prison operations when temperatures are considered to constitute extreme heat.
Defendants contend that this discovery is overbroad because it relates to a three-year period, encompasses system-wide TDCJ policies and conditions rather than those only at the Garza West Unit, and covers complaints by inmates without medical conditions like Hinojosa’s. Defendants also seize on the discovery order’s observation that factual development was necessary as to “whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned fa *673 cilities when in transport,” apparently interpreting this line to authorize discovery as to whether TDCJ inmate-transportation vehicles are equipped with air conditioning. Defendants also dismiss as “irrelevant” their general knowledge about prison heat, whether they conducted studies or consulted with UTMB officials, TDCJ policies regarding operations during extreme temperatures, when and how they learned of other inmate deaths, their familiarity with our precedent, their receipt of correspondence from wardens regarding heat-related issues, and whether policies were implemented or changed. Finally, Defendants contend that they have already provided “extensive discovery” in other similar cases, making the district court’s discovery order unnecessary.
As a preliminary matter, we do not agree that the district ■ court’s order authorizes discovery regarding inmate transportation in TDCJ vehicles. The district court observed that discovery was needed to determine “whether the TDCJ Defendants personally consulted with UTMB officials in regards to the transportation and housing of at-risk inmates during the summer months,” and “whether the TDCJ Defendants considered that at-risk inmates be maintained in air-conditioned facilities when in transport.” In making this observation, the district court appears to have used the words “transportation” and “transport” to mean the movement of inmates into a transfer facility, such as the Garza West Unit, and then through the prison system. The transportation of inmates in non-air-conditioned TDCJ vehicles has never been at issue in this ease, and in any event, the district court’s order never discusses the matter. Moreover, the complaint specifically alleges that inmates are most vulnerable when moved from air-conditioned county jails into non-climate-controlled transfer facilities, like the Garza West Unit, because of the temperature change and lack of opportunity to acclimatize. Viewed alongside the nature of the complaint’s allegations, Defendants’ strained reading of the district court’s use of the words “transportation” and “transport” is mistaken.
We also disagree with Defendants’ assertion that much of the ordered discovery was “irrelevant.” The complaint sets out an Eighth Amendment claim by alleging deliberate indifference to dangerous heat conditions in TDCJ facilities. Assuming that the complaint’s allegations are true, to be entitled to qualified immunity, Defendants must show either that they were not deliberately indifferent to the heat risk, or that their actions were reasonable in light of clearly established law. What Defendants knew about prison heat and its risks (especially for vulnerable inmates with medical conditions like Hinojosa’s), when and how Defendants acquired such knowledge, whether Defendants investigated the risk and explored possible remedial measures, and whether Defendants adopted policies to respond to the heat risk are factual issues highly relevant to evaluating the reasonableness of Defendants’ actions. In addition, we reject Defendants’ contention that their provision of extensive discovery in other similar cases renders superfluous any discovery in the instant case. If anything, this fact cuts in the other direction, suggesting that the plaintiff in this case will similarly be able to discover a great deal of relevant material. Regardless, discovery for one plaintiff in one case is not superfluous simply because other plaintiffs in other cases have had an opportunity to conduct it.[7]
*674 Defendants’ strongest argument concerns the discovery order’s breadth and timeframe, inasmuch as it allows discovery regarding TDCJ system-wide policies or procedures and Defendants’ knowledge of any inmates’ heat-related complaints during a three-year period. Hinojosa died in the summer of 2012. With the exception of two inmate deaths dating back to 2007 and one other death in 2012, the other alleged inmate deaths all took place during the summer of 2011. In addition, the complaint focuses its allegations on TDCJ transfer facilities, like the Garza West Unit, where inmates typically arrive from air-conditioned county jails. However, the district court’s order permits discovery not only into Defendants’ knowledge of policies and procedures in place at the Garza West Unit and other similar transfer facilities, but also system-wide TDCJ policies and procedures. Furthermore, while the complaint focuses on Hinojosa’s vulnerability to the heat due to his conditions and medications, the district court’s order allows discovery regarding Defendants’ knowledge of all inmates’ heat-related complaints, not simply those of vulnerable inmates like Hinojosa.
Defendants advance a colorable argument that these discovery items are broader than necessary, but ultimately we are not persuaded. In a vacuum, the most relevant time period for discovery would seem to begin with the summer of 2011, during which ten TDCJ inmates allegedly perished from heat-related causes. However, we cannot say with any certainty that discovery into Defendants’ knowledge of inmate complaints dating back to the summer of 2010 would be unnecessary. According to the complaint, by the summer of 2010, two inmates had already died from heat-related causes. Whether Defendants knew about inmate complaints during the summer of 2010 would shed light on the reasonableness of their actions. Likewise, while Defendants’ knowledge of heat-related policies and procedures in place at the Garza West Unit and similar transfer facilities is more probative than their knowledge of policies and practices at other TDCJ facilities, we cannot say that discovery as to the latter is unnecessary. Defendants’ knowledge of any heat-related TDCJ policy or procedure (or lack thereof) would bear on whether they acted reasonably in promulgating (or declining to change) the alleged policies for which the complaint seeks to hold them responsible. The same holds true for the district court’s authorization to discover [1] Defendants’ knowledge of complaints by all inmates rather than simply complaints by those inmates with medical vulnerabilities. See Gates, 376 F.3d at 340 (observing that prior complaints by other inmates are probative of deliberate indifference). Both are relevant to the reasonableness of Defendants’ actions, and we cannot say that discovery regarding the former — though perhaps less probative than the latter — is unnecessary.
To the extent we might have any lingering doubt about the breadth of the discovery order, we note that the district court was careful to state that discovery will be “limited to the personal knowledge and personal conduct of each Defendant as it relates to Albert Hinojosa and the circumstances leading to his death.” This provides an outer boundary for all of the specific discovery items that follow, and those items should be interpreted with that boundary in mind. If Plaintiff requests discovery that is irrelevant to Defendants’ knowledge and personal conduct regarding Hinojosa and the circumstances leading to his death, Defendants can seek *675 enforcement of the plain language in the district court’s order that prohibits such discovery.
V.
Because, as set forth above, the district court’s order complies with our precedent, we DISMISS this interlocutory appeal for want of jurisdiction. We express no opinion on how the district court should rule on Defendants’ qualified immunity defense.

. For purposes of this appeal, we take the complaint’s factual allegations as true and view them in the light most favorable to the plaintiff. See Atteberry v. Nocona Gen. Hosp., 430 F.3d 245, 252 (5th Cir.2005).

. Ramona Hinojosa passed away during the pendency of this appeal, and Rene Arturo Hinojosa — Ramona's grandson and Albert’s nephew — is now pursuing this suit as representative of Ramona's estate.

. By law, the indoor temperature of Texas county jails generally must be kept between 65°F and 85°F. See 37 Tex. Admin. Code §§ 259.160, 260.154.

. As detailed in the complaint, at the time of Hinojosa’s death, Brad Livingston was the executive director of TDCJ, Rick Thaler was the director of TDCJ's Correctional Institutions Division, and William Stephens was the deputy director of the Correctional Institutions Division. The complaint asserts that in their capacities, Livingston, Thaler, and Stephens exercised administrative authority over all TDCJ employees working in TDCJ institutions, including those working in the Garza West Unit.

. In their initial brief, Defendants argue that ‘‘[a] prison conditions claim by a prisoner convicted of a crime is governed by the Eighth and not the Fourteenth Amendment,” and "[b]ecause the Complaint does not claim that Hinojosa was a pre-trial detainee, the Fourteenth Amendment claim should have been dismissed.” Defendants misunderstand the complaint’s invocation of the Fourteenth Amendment. The complaint invokes the Fourteenth Amendment simply because it is by that provision — and that provision alone— that the Eighth Amendment’s guarantee applies against the States; the Eighth Amendment does not apply of its own force to the States. See Robinson, 370 U.S. at 666-67, 82 S.Ct. 1417 (holding that the Fourteenth Amendment makes the Eighth Amendment's guarantee applicable against the States and concluding that the state law challenged in that case "inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment ”) (emphasis added); see also McDonald v. City of Chicago, 561 U.S. 742, 765, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (noting that the Court has "held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards *665 that protect those personal rights against federal encroachment’ ”) (emphasis added) (quoting Malloy v. Hogan, 378 U.S. 1, 10, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). Indeed, contrary to Defendants' argument, nothing in the complaint or in Plaintiff’s briefs suggests any intention to bring a pre-trial detention conditions-of-confinement claim.

. The complaint refers to the following heat-condition cases brought by inmates: Ruiz v. Johnson, 37 F.Supp.2d 855 (S.D.Tex.1999), rev'd and remanded sub nom. Ruiz v. United States, 243 F.3d 941 (5th Cir.2001); Valigura v. Mendoza, 265 Fed.Appx. 232 (5th Cir.2008); Blackmon v. Kukua, 758 F.Supp.2d 398 (S.D.Tex.2010), rev’d and remanded sub nom. Blackmon v. Garza, 484 Fed.Appx. 866 (5th Cir.2012). It also refers to a pending lawsuit, McCollum v. Livingston, No. 3:12-cv-2037 (N.D.Tex.), which arose from one of the *667 deaths described in the complaint. In its order, the district court took notice that additional wrongful death lawsuits similar to the present one have been filed against TDCJ and Defendants, and it cited one of them, Webb v. Livingston, No. 6:13-cv-711 (E.D.Tex.).

. Nothing in our opinion should be construed to prevent Defendants from asking the district court to consolidate discovery proceedings *674 with the discovery proceedings in other related cases.

. Cf. Spotts v. United States, 613 F.3d 559 (5th Cir.2010).