JONES, Circuit Judge,
dissenting:
No one doubts the tragedy of a prisoner’s life lost to heat stroke during a hot Texas summer. The question here, however, is not whether better prison policies or procedures might theoretically have prevented Hinojosa’s death in the Garza West transfer unit of the Texas Department of Criminal Justice (“TDCJ”). As in all cases of qualified immunity, the question is whether the three top officials of the TDCJ (“Executive Defendants”), whose 111 institutions supervise over 150,-000 prisoners at a time, must endure litigation and potential personal liability in damages for this prisoner’s death because of some arguably defective “condition of confinement.” See Mullenix v. Luna, 577 U.S. -, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (summarily reversing Fifth Circuit denial of qualified immunity to police officer because his conduct did not violate clearly established law under the circumstances he confronted). I would also reverse the district court order denying qualified immunity on the pleadings. See Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (“Unless the plaintiffs allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the ■commencement of discovery.”) (emphasis added).
The majority opinion here violates the clearly established law of qualified immunity by holding that under “clearly established” constitutional law, these officials may have been deliberately indifferent to the vaguely specified conditions under which Hinojosa succumbed. This is because there is no allegation that they directly participated in any way in the management of this prison unit, and the plaintiff herself makes significant countervailing allegations about TDCJ policies, training, and procedures designed to address the risks of high temperatures. If the majority opinion is correct, then the top TDCJ officials might also be personally liable for any other injury-causing “condition of confinement” — a salmonella outbreak in a prison unit’s food service, the crash of a prison transport bus, a mishandled hurricane evacuation,[1] slippery prison showers, or even heart attacks or prison suicides.
The implications for suicide prevention would be obvious, except that the majority opinion is squarely at odds with the Supreme Court’s decision in Taylor v. Barkes, which held as a matter of law that the top official of the Delaware prison system and the particular institution’s warden violated no “clearly established law” by failing to oversee “proper implementation of adequate suicide prevention protocols.” - U.S. -, 135 S.Ct. 2042, 2044, 192 L.Ed.2d 78 (2015) (per curiam). In so doing, the Court overruled a Third Circuit decision denying summary judgment. Statistically, far more prisoner deaths are caused by suicide than heat stroke,[2] and *676 the Court did not deny that generally, the prisons are responsible for the protection of inmates. See, e.g., Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Yet, the Supreme Court summarily reversed, holding that no court opinion has placed beyond doubt a prisoner’s right to the proper implementation of adequate suicide prevention protocols, much less “identif[ied] any minimum screening procedures or prevention protocols that facilities must use.” Taylor, 135 S.Ct. at 2044-45.
By the lights of Taylor, Mullenix, and many other Supreme Court decisions, the majority opinion is indefensible for two primary reasons. First, it defines the allegedly “clearly established right” of Hino-josa in an overbroad and ambiguous way, the antithesis of what qualified immunity stands for. Qualified immunity is due these officials as a matter of law. Second, it affords credence to pleadings that are insufficient under Iqbal[3] to raise a question about these officials’ liability under any circumstances. The pleadings thus failed to state a claim under Rule 12(b)(6).[4]
I. BACKGROUND
A brief synopsis of the relevant pleadings and the majority’s characterization of the alleged constitutional violations is important. Hinojosa was transferred to the Garza West transfer unit, which houses well over 2,000 inmates, in August 2012. He was middle aged and obese and was under medication for hypertension, diabetes, and schizophrenia. Within two days of his arrival at this non-air conditioned facility, another prisoner in his dorm room observed him going into convulsions late at night and called for medical help. It took about two hours for “emergency” assistance to arrive, and Hinojosa was pronounced dead shortly thereafter. No facts are pled about remediation within the prison unit for heat conditions other than an alleged gross deficiency of drinking water and personal (not institutional) fans.
Hinojosa’s lawsuit included as defendants not only the three top officials of the TDCJ, appellants here, but also the head of the Correctional Managed Care Program at the University of Texas Medical Branch-Galveston, which is responsible for medical care of most TDCJ inmates, regional administrators, and wardens. Relevant to these top officials, the majority opinion culls from the plaintiffs pleadings as follows: TDCJ policies “reflect” the officials’ knowledge that prisoners with medical conditions and treatment like Hinojo-sa’s are unusually susceptible to excessive heat. TDCJ “policies” acknowledge the importance of acclimating inmates “to re *677 duce the risk of heatstroke” as they transfer from air conditioned county jails to TDCJ, “but TDCJ did not have any housing assignment policy for newly arrived inmates to help them acclimatize [sic].” More precisely put, TDCJ “policies” specify that (a) newly arrived inmates with heat-sensitive conditions may not work or engage in recreation in high temperature conditions, and (b) no newly arrived inmates may labor outdoors until they have had an intake physical exam, which may not occur for up to ten days. “[T]hey are nonetheless housed in high indoor temperatures along with the rest of the inmate population.” These defendants’ “policies” made no accommodation for newly arrived inmates or inmates with heat-sensitive medical conditions. These defendants “failed to ensure that inmates timely received intake physicals, and failed to implement any other protective procedures.” Livingston allegedly “took part in the decision not to employ medical staff at the Garza West Unit during night hours, and ... all three supervisory Defendants were responsible for an alleged lack of adequate training that correctional officers received.”
The majority omit mentioning many other allegations in the plaintiffs complaint directed to proving liability on the part of the medical defendants and wardens who were situated closer to or at Garza West. These telling allegations include:
• Dr. Owen Murray of the UTMB’s Correctional Managed Care Program “oversees the medical, mental health and dental services provided to prisoners [in] ... the Garza West Unit.” (Pl.’s Compl. at ¶ 13.)
• “Murray is responsible for ensuring that TDCJ facilities serviced by UTMB provide adequate health care to prisoners, that prisoners have access to adequate health care, that infirmaries at units ... are adequately staffed to handle medical conditions and emergencies that occur, and for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not subjected to dangerous conditions as a consequence of their health issues and medical needs.” (Id. at ¶ 31.)
• “Murray has not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat.” (Id. at ¶ 41.)
• “As the wardens and regional director, respectively, Guterrez and Kennedy are directly responsible for training the front-line officers charged with protecting prisoners’ lives.” (Id. at ¶ 73.)
• “[A]fter ... two men died in 2007, Dr. Murray instituted no changes to UTMB’s intake and housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.” (Id. at ¶ 78.)
• “Despite ... ten deaths in 2011, Dr. Murray and UTMB continued to house vulnerable inmates in extremely hot temperatures without any protections. And he did this knowing that some areas of TDCJ units, including at Garza West Unit, have air conditioned spaces available.” (Id. at ¶ 89.)
According to the majority and the plaintiff, this is an Eighth Amendment “conditions of confinement” case in which liability is based on an objective standard of constitutionally inhumane prison conditions and a subjective standard embodying the defendants’ deliberate indifference to those conditions. Ball v. LeBlanc, 792 F.3d 584, 592 (5th Cir.2015). In such circumstances, it is unnecessary to demonstrate that top officials of TDCJ either *678 personally participated in or knew about Hinojosa’s imprisonment so long as they knew generally of the risk of high heat to particularly vulnerable prisoners. Consequently, according to the majority, these defendants are not being sued “in their supervisory capacity,” but rather for “their own actions in promulgating — and failing to correct — intake and housing policies that exposed Hinojosa and other inmates like him to extreme temperatures without adequate remedial measures.”
The defendants’ qualified immunity defense is rejected by the majority because the “right that [the complaint] asserts ... is the well-established Eighth Amendment right not to be subjected to extremely dangerous temperatures without adequate ameliorative measures.” The majority concede that “[w]hile we have not had occasion to give an exhaustive list of acceptable remedial measures, we have held that the provision of fans, ice water, and daily showers can suffice.” See Gates v. Cook, 376 F.3d 323, 339-40 (5th Cir.2004).[5] The majority conclude that immunity cannot be awarded on the pleadings because “[a] reasonable prison official in our circuit knows that during times of extreme heat, he must afford these remedies — or remedies like them — to satisfactorily address the risk of heat-related illnesses and fatalities.” The majority finds sufficient to overcome qualified immunity the allegations that “Defendants knew that prisoners such as Hinojosa were particularly vulnerable to the heat, and that through the intake and housing policies that they promulgated, they failed to ensure that such prisoners received any meaningful relief.” In short, the Defendants, under these allegations “subjected Hinojosa to extreme temperatures without adequate remedial measures, in violation of our circuit’s clearly established law.”
The majority finally condone a long list of discovery inquiries allegedly relevant to how much these defendants knew about heat-related issues in TDCJ. According to the majority, such discovery (which has already encompassed thousands of papers and depositions in similar pending cases) bears on defendants’ knowledge, which is allegedly relevant both to their subjective states of mind and the objective reasonableness of their actions for liability and qualified immunity purposes.
II. QUALIFIED IMMUNITY
The panel majority should have proceeded along the same lines as the Court in Taylor v. Barkes. In Taylor, the Third Circuit approached qualified immunity by determining first that the plaintiffs had alleged a cognizable theory of supervisory liability, but the Supreme Court declined to consider that issue. Taylor, 135 S.Ct. at 2043. Instead, the Court reversed the lower court because “an incarcerated person’s right to the proper implementation of adequate suicide prevention protocols” is not a clearly established constitutional right. Id. at 2044.
Taylor succinctly expressed the basic standards for qualified immunity:
“Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.” Reichle v. Howards, — U.S. -, 132 S.Ct. 2088, 2093, 182 L.Ed.2d *679 985 (2012). “To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right.” Id. (brackets and internal quotation marks omitted). “When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law.” Ashcroft v. al-Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (internal quotation marks omitted). ‘We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.” Id. at 2083.
135 S.Ct. at 2044 (parallel citations omitted). Here, as in Taylor, the Executive Defendants were neither plainly incompetent nor knowing lawbreakers. The alleged actions of the Executive Defendants were not objectively unreasonable in light of the clearly established law at the time of the violation, and they are entitled to immunity from suit.
The majority assert the right that was “clearly established” at the time of Hinojo-sa’s death is the right to “be free from exposure to extremely dangerous temperatures without adequate remedial measures.” This “right” is a tautology. Under this formulation, what “reasonable but mistaken judgment” could the Executive Defendants have made about what the law requires? See al-Kidd, 131 S.Ct. at 2085. If this is the “clearly established right,” then qualified immunity would cease to exist: if adequate remedial measures were in place, there would be no constitutional violation; if reasonable remedial measures fell short of being adequate, there would be liability. See Morgan v. Swanson, 659 F.3d 359, 372 (5th Cir.2011) (en banc) (“Further, the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law.”)
This broad definition of the “clearly established right,” which the majority opinion repeats three times in its discussion of qualified immunity and again in purporting to distinguish Taylor, is far more general than the precise policy deficiencies charged against the Executive Defendants-intake, housing, and medical policies geared to inmates with heat sensitive medical conditions. Yet only “clearly established law” that is tailored to the specific facts confronted by a defendant suffices to deprive him of qualified immunity. Brosseau v. Haugen, 543 U.S. 194, 198, 125 S.Ct. 596, 599, 160 L.Ed.2d 583 (2004) (per curiam) (“It is important to emphasize that this inquiry ‘must be undertaken in light of the specific context of the case, not as a broad general proposition.’ ”) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001)).
This overbreadth is a significant error in the majority’s analysis. The right to be free from extreme temperatures without adequate remedial measures is too generalized to be of any use to the Executive Defendants in deciding what actions they should or should not take regarding system-wide policies. The qualified immunity doctrine is “highly context-sensitive.” McClendon v. City of Columbia, 305 F.3d 314, 332 n. 13 (5th Cir.2002) (en banc) (per curiam). And the Supreme Court has repeatedly and frequently instructed — recently with some exasperation — that courts should not “define clearly established law at a high level of generality.” al-Kidd, 131 S.Ct. at 2084. Instead, the right must be defined so that it is “beyond debate” that “every reasonable official would have understood that what he is doing violates that right.” Id. at 2083 (internal quotation marks omitted) (quoting Anderson v. Creighton, 483 U.S. 635, *680 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). The Supreme Court’s guidance underlines the real world implications of the qualified immunity analysis. General principles are of limited use to prison officials who must often make difficult policy choices in highly fact-dependent situations. Because reasonable mistakes are inevitable in these settings, the “clearly established” requirement protects mistaken judgments.
Here, it would not have been clear to a reasonable official in the position of the Executive Defendants that his conduct was unlawful in the situation confronted. Certainly it would not be “beyond debate” that the failure to establish specific intake, medical, or housing policies other than those in place when Hinojosa died would result in ah Eighth Amendment violation. Assuming arguendo the majority’s characterization of the right at issue, all that has been fairly established by this court’s precedent is that in the face of high temperatures, some measures must be adopted to provide “relief,” Smith v. Sullivan, 553 F.2d 373, 381 (5th Cir.1977), including, in limited circumstances, extra fans, ice water, and daily showers,[6] Gates, 376 F.3d at 336. But see Woods v. Edwards, 51 F.3d 577, 581 (5th Cir.1995) (per curiam) (“While the temperature in extended lock-down may be uncomfortable, that alone cannot support a finding that the plaintiff was subjected to cruel and unusual punishment in violation of the Eighth Amendment.”)
Further limiting these cases’ applicability to the Executive Defendants’ qualified immunity is that all were confined to particular inmates or particular sections of prisons. Gates, for instance, was an injunction limited to Mississippi’s death row; Smith an injunction placed upon the El Paso County Jail. This distinction is critical because the Supreme Court has admonished that the clearly established law should generally be derived from cases that “squarely govern[ ]” the facts presented. Brosseau, 543 U.S. at 201, 125 S.Ct. at 600. Measures that are necessary or appropriate to address high temperatures at one prison unit may not be constitutionally required at another. Compare, at just one analytical level, the needs of medical units, low security units, and high security units. It makes no sense to extrapolate from a couple of fact-dependent prison conditions cases the constitutional requirements for TDCJ’s policies covering its 111 statewide units. Indeed, even the majority opinion concedes there is no “exhaustive list of acceptable remedial measures” in prior cases, leaving only “remedies like them” as the vague constitutional baseline. In other words, not one of the housing and intake policies advocated in the complaint and the majority opinion are required or even mentioned in this court’s clearly established law.[7] It is disingenuous to conclude *681 that it would have been clear to any reasonable Executive Defendant that his conduct violated an established constitutional right.[8]
Moreover, the plaintiffs complaint demonstrates that the Executive Defendants acted reasonably under these circumstances. The complaint discusses that TDCJ policies recognized the risk of heat stroke. (See PL’s Compl. at ¶¶ 19, 48-50.) The complaint discusses that TDCJ training covers the risk of heat stroke. (Id. at ¶¶ 71-72.) The complaint avers that TDCJ policy requires the provision of a certain amount of water per day. (Id. at ¶ 60.) The complaint specifies that, under current policies, all prisoners arriving at Garza West were forbidden to labor outdoors until they had a physical exam, and those with heat-sensitive conditions could neither labor nor engage in recreation in high temperature conditions. (Id. at ¶¶ 65, 123.)
The plaintiffs mere dissatisfaction with the specificity and breadth of policy and training does not render the policies objectively unreasonable for the purposes of qualified immunity. See, e.g., Whitt v. Stephens Cty., 529 F.3d 278, 284 (5th Cir.2008). The Supreme Court has cautioned against second-guessing the specificity and coverage of existing policy and training in the context of § 1983 damages actions because every time a state actor violates a constitutional right, “a § 1983 plaintiff will be able to point to something the [state] ‘could have done’ to prevent the unfortunate incident.” Connick v. Thompson, 563 U.S. 51, 131 S.Ct. 1350, 1363, 179 L.Ed.2d 417 (2011) (quoting City of Canton v. Harris, 489 U.S. 378, 392, 109 S.Ct. 1197, 1206, 103 L.Ed.2d 412 (1989)).
In fact, as the complaint recognizes, the state did do something to address potential adverse medical consequences of high temperatures: these defendants rely on the University of Texas Medical Branch-Galveston in formulating policies and taking actions relating to the health and medical safety of prisoners. (Pl.’s Compl. at ¶¶ 13, 15, 31, 143.) Our case law allows prison officials to defer to medical professionals on a wide range of health issues. See, e.g., Brauner v. Coody, 793 F.3d 493, 501 (5th Cir.2015). Because our cases have sometimes held prison officers liable for not seeking professional medical attention for prisoners, few things seem more reasonable than relying on the judgment of a well-respected medical organization to address health and safety policies concerning the prevention and treatment of heat stroke. See, e.g., Thompson v. Upshur Cty., 245 F.3d 447, 457-64 (5th Cir.2001) (reviewing cases and holding that a jail official violated clearly established law by failing to “arrang[e] for professional medical assistance for ... serious medical need”); Domino v. Tex. Dep’t of Criminal Justice, 239 F.3d 752, 756 (5th Cir.2001) (calling decisions to provide medical treatment a “classic example of a matter for medical judgment”); see also Lee v. Young, 533 F.3d 505, 511 (7th Cir.2008) (“[I]n determining the best way to handle *682 an inmate’s medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals.”).
It is not clearly established that TDCJ needed to have more specific policies regarding how to deal with heat-vulnerable prisoners during high heat conditions. It is certainly reasonable for the Executive Defendants to rely on subordinates, be they doctors or wardens or prison guards, to take the necessary steps to address problems that arise on an individual or unit level. See Johnson v. Johnson, 385 F.3d 503, 526 (5th Cir.2004) (“Like all prison officials, these supervisory defendants have a duty to take reasonable measures to protect inmates. Yet given the size of the operation that they oversee, they cannot be expected to intervene personally” in every threat that arises.) (citation omitted). Without more definitive court rulings, it is not objectively unreasonable when prison policies and training exist to avert heat-related illness, but they ultimately prove inadequate to address every conceivable situation.
Contrary rules would implicate a core function of qualified immunity: government efficiency and effectiveness. See Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982) (describing one of qualified immunity’s chief concerns as “the diversion of official energy from pressing public issues”). Imagine if TDCJ’s Executive Director had to personally oversee the amount and temperature of water afforded to prisoners at all 111 TDCJ facilities or else face the risk of personal liability. (See Pl.’s Compl. at ¶ 60 (“Throughout the system ... the jugs did not contain enough water for each prisoner to drink enough to protect them from the heat, and are frequently filled with lukewarm water.”)). Such a rule would reduce government functioning to a crawl while high-level officials micromanaged their subordinates for fear that mistakes would subject them to “punitive and compensatory” judgments in federal court. (See id. at ¶¶ 8-10.)
This leads us back to Taylor v. Barkes, which should control this case, but which the majority confine to a dismissive paragraph. Taylor also originated in tragedy: a jail suicide. 135 S.Ct. at 2043. The plaintiffs sued the head of the Delaware Department of Corrections and the prison warden for failing to prevent the suicide by not properly supervising the medical personnel who administered the suicide screening protocol. Id. Denying summary judgment, the Third Circuit found it clearly established that a “particular vulnerability to suicide” was a serious medical need encompassed within the Eighth Amendment. Barkes v. First Corr. Med., Inc., 766 F.3d 307, 328-29 (3d Cir.2014), rev’d sub nom., Taylor, 135 S.Ct. at 2044. The Third Circuit then pivoted to conclude that such a finding “plaee[d] it beyond debate that appropriate suicide-preventive measures are a required component of the Constitution’s command that prison administrators provide adequate mental and physical health care for inmates.” Id. at 329 (citation and internal quotation marks omitted).
A unanimous Supreme Court summarily reversed and granted qualified immunity as a matter of law. Id. at 2044. The Court held that even under Third Circuit precedent, a right “to the proper implementation of adequate suicide prevention protocols” was not clearly established. Id. The Court recognized that the Third Circuit’s cases may' establish that where prison officials “know ... of the particular vulnerability to suicide of an inmate, they have an obligation not to act with reckless indifference to that vulnerability.” Id. at 2045 (internal quotation marks omitted) *683 (quoting Colburn v. Upper Darby Twp., 838 F.2d 663, 669 (3d Cir.1988)). But such cases did not clearly establish “that detention facilities must implement particular procedures to identify such vulnerable inmates, let alone specify what procedures would suffice” or “identify any minimum screening procedures or prevention protocols that facilities must use.” Id. In this light, the Court concluded, “even if the [jail’s] suicide screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books ... would have made clear to petitioners that they were overseeing a system that violated the Constitution.” Id. (emphasis added).
The parallels between Taylor and this case are obvious. Like the Third Circuit majority, the majority here affirm an Eighth Amendment right of medically vulnerable inmates not to be subjected to extreme temperatures without adequate remedial measures. Like the Third Circuit majority, the panel majority here approve a claim that these defendants were deliberately indifferent to the inmate’s serious medical needs because their policies failed to provide certain “adequate remedial measures” or “measures like those” mentioned in prior circuit case law. Moreover, as in Taylor, it is alleged that the Executive Defendants knew their system was inadequate because thirteen other inmates died from heatstroke in five years before Hinojosa’s death. The Taylor plaintiffs also explicitly alleged that the Delaware prison officials “were aware that the suicide rate in the Delaware prisons was above the national average.” Third Am. Compl. at ¶ 54(i), Barkes v. First Corr. Med., Inc., No. 06-104-LPS, 2012 WL 2914915 (D.Del. July 17, 2012).
The majority’s analytical mistake in this decision is the same mistake made by the Third Circuit. Simply substituting “heat stroke” for “suicide” in the Supreme Court’s language proves my point. Paraphrasing Taylor,
[Fifth Circuit] cases may establish that where prison officials “know ... of the particular vulnerability to [heat stroke] of an inmate, they have an obligation not to act with reckless indifference to that vulnerability.” Taylor, 135 S.Ct. at 2045 (internal quotation marks omitted). But that does not clearly establish “that detention facilities must implement procedures to identify such vulnerable inmates, let alone specify what procedures would suffice” or “identify any minimum screening procedures or prevention protocols that facilities must use.” Id. (emphasis added). Thus, “even if [TDCJ’s heat vulnerability and heat stroke] screening and prevention measures contained the shortcomings that respondents allege, no precedent on the books [in August 2012] would have made clear to petitioners that they were overseeing a system that violated the Constitution.” Id.
No prior Fifth Circuit case comes close to giving these Executive Defendants fair notice that they needed additional system-wide housing, medical, or intake policies to avoid running afoul of the Constitution and exposing themselves to personal liability. This court should grant the Executive Defendants’ motion to dismiss.
III. SUFFICIENCY OF PLEADING EXECUTIVE DEFENDANTS’ LIABILITY
Underlying all qualified immunity cases is the question “whether the plaintiff has asserted a violation of a constitutional right at all.” Siegert v. Gilley, 500 U.S. 226, 231-32, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). The plaintiff must assert the constitutional violation in a complaint containing “sufficient factual matter, *684 accepted as true, to ‘state a claim to relief that is plausible on its face.’” Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). A complaint consisting of “labels and conclusions” or “naked assertion[s] devoid of further factual enhancement” will not suffice. Id., 129 S.Ct. at 1950 (alteration in original) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555, 557, 127 S.Ct. at 1965-66). Instead the plaintiff must plead enough facts to “nudge[ ] [the] claims ... across the line from conceivable to plausible.” Id. at 680, 129 S.Ct. at 1951 (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 570, 127 S.Ct. at 1960).
To assert a violation of the Eighth Amendment for deliberate indifference to an inmate’s health or safety, the plaintiffs complaint must plausibly allege that “prison conditions ... pose[d] an unreasonable risk of serious damage” to the plaintiff and that prison officials “acted with deliberate indifference to the risk posed.” Ball, 792 F.3d at 592 (internal quotation marks omitted). Deliberate indifference is not mere negligence; the plaintiff must allege more than that the Executive Defendants should have known about the risk. See Farmer, 511 U.S. at 835-36, 114 S.Ct. at 1978. Instead, the plaintiff must plead that the Executive Defendants actually knew about the risk and failed to respond reasonably in the face of it. See id. at 844-45, 114 S.Ct. at 1982-83; see also Johnson, 385 F.3d at 524 (“Finally — and significantly ... — there is no liability if the official responded reasonably to the risk, even if the harm ultimately was not averted.”) (internal quotation marks omitted); cf. Taylor, 135 S.Ct. at 2045 (characterizing Third Circuit cases as holding that where prison officials “know ... of the particular vulnerability to suicide of an inmate, they have an obligation not to act with reckless indifference to that vulnerability.”).
Despite its length, the plaintiff’s complaint here is rife with bare conclusional allegations against the Executive Defendants and irrelevant specific allegations. The complaint fails to plead their knowledge of unconstitutional conditions at Garza West and in fact demonstrates that they acted reasonably to provide “adequate remedial measures.”
A. Generalized, conclusional allegations
The Supreme Court has made plain that, “[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.” Iqbal, 556 U.S. at 677, 129 S.Ct. at 1949. When the plaintiffs complaint uses blanket terms covering all the defendants, by lumping them together or calling them collectively “TDCJ,” these allegations are properly disregarded unless the reference to the Executive Defendants can be clearly inferred. Accord. Weiland v. Palm Beach Cty. Sheriff's Office, 792 F.3d 1313, 1323 & n. 14 (11th Cir.2015) (describing this form of “shotgun pleading” as a “sin” consisting of “asserting multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions”). For instance, the plaintiff alleges that “Defendants provide grossly inadequate amounts of water to help prisoners survive the extremely-high temperatures indoors.” (Pl.’s Compl. at ¶ 60.) It is not a plausible inference that -TDCJ Executive Director Brad Livingston, all the way from his Huntsville office, personally provides grossly inadequate amounts of water to prisoners in BeeVille, Texas. All such allegations should have been disregarded.
The complaint against the Executive Defendants depends on three propositions *685 that they allegedly knew. First, excessive heat can be deadly.[9] Second, excessive heat can be even riskier for those with certain medical conditions.[10] Third, the Executive Defendants knew that it could be extremely hot in the units of the Texas prison system, including at Garza West.[11] These bare accusations of knowledge are “not entitled to the assumption of truth.” See Iqbal, 556 U.S. at 680, 129 S.Ct. at 1951 (rejecting a similar allegation that defendant “knew of [and] condoned ... [the] harsh conditions of confinement”) (internal quotation marks omitted). In a case charging a former Texas prison director with liability for an inmate-on-inmate murder, this court long ago rejected similar allegations of knowledge and con-donation, declaring that even when coupled with “conclusory allegations and ... technical buzz words” they flunked the minimal pleading standard. See Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir.1986) (Reavley, J.). Thus, allegations that there was a substantial risk to vulnerable inmates from the heat and the Executive Defendants were aware of it merely track the elements of a deliberate indifference claim but do not alone suffice to allege an Eighth Amendment violation. See Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949 (“A pleading that offers ... a formulaic recitation of the elements of a cause of action will not do.”) (internal quotation marks omitted).
The conclusory and threadbare nature of these allegations is to be expected, of course. The Executive Defendants oversee an entity that houses, clothes, feeds, and cares for 150,000 people a day across 111 different facilities. There is no allegation that the Executive Defendants played any direct role in the management of the Garza West unit, much less in Hinojosa’s intake or incarceration. See id. at 679, 129 S.Ct. at 1950 (“Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.”). That is the nature of large, complex organizations and the reason why prisoner lawsuits are almost always directed at a unit’s *686 warden or individual guards, not the TDCJ Executive Director and his immediate subordinates. Because the Executive Defendants do not bear vicarious liability for the actions or inaction of subordinates, it is more challenging for a plaintiff plausibly to allege facts showing these defendants’ deliberate indifference.
Consequently, this court has uniformly affirmed dismissal or otherwise rejected personal liability for high-ranking prison officials when knowledge is based only on system-wide problems. In addition to Jac-quez, this court, in Walker v. Livingston, rejected a theory of Livingston’s liability for an inmate’s murder based on knowledge and condonation of systemic deficiencies. We concluded that there were no allegations of “any facts or any sort of knowledge on the part of these defendants that would suggest any reason to believe there was any likelihood of actual subjective awareness on their respective parts of the specific risk to [the plaintiff].” 381 Fed.Appx. 477, 480 (5th Cir.2010); see also Lott v. Edenfield, 542 Fed.Appx. 311, 315 (5th Cir.2013); Hinojosa v. Johnson, 277 Fed.Appx. 370, 379 (5th Cir.2008). In sum, allegations that the Executive Defendants knew generally of risks in the prison system from high temperatures do not make it plausible they were deliberately indifferent to the unconstitutional conditions in Garza West.[12]
B. Specific Allegations
To shore up otherwise insufficient general allegations, the complaint relies on several facts' designed to allow an inference of the Executive Defendants’ deliberate indifference. First, thirteen other TDCJ prisoners died from heat stroke between 2007 and 2012. Second, several lawsuits have been pursued against TDCJ for alleged heat-related injuries. Third, TDCJ policies recognize the risk of heat stroke. Fourth, pigs receive more air conditioning than prisoners. Fifth, a Texas state representative sent a letter to TDCJ in 2011 expressing concern about the high temperatures and asking that TDCJ take preventative measures. Finally, as the majority opinion asserts, the “open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference.”
Arguably the most substantial factual allegation is that the Executive Defendants knew that thirteen other prisoners with various medical conditions died from heat stroke between 2007 and 2012. According to the complaint, these deaths were “regularly discussed” at meetings attended by Thaler and Stephens (but evidently not Livingston). Again, the complaint pleads little more than that the Executive Defendants “knew” a fact, instead of pleading how they knew and the significance of that knowledge. See Jacquez, 801 F.2d at 792 (dismissing a complaint against Texas prison director where plaintiff “omit[ted] any explanation of how or in what way the defendants knew” of an imminent attack against one inmate) (internal quotation marks omitted). That the deaths were “regularly discussed” at high-level meetings is nothing if not vague about the nature or extent of the discussion. See Bosarge v. Miss. Bureau of Narcotics, 796 F.3d 435, 443 (5th Cir.2015) (“[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross the line between the conclusory and the factual.”) (alteration in original) (internal quotation marks omitted) (quoting Peñal- *687 bert-Rosa v. Fortuno-Bwrset, 631 F.3d 592, 595 (1st Cir.2011)).
Even accepting that the Executive Defendants were aware of these deaths, this allegation lacks the context necessary to evaluate it. In a prison system housing over 150,000 inmates at any given time, it is hardly plausible that thirteen deaths over six years from a single cause raise awareness of a substantial risk to the inmate population.[13] While we must view well-pleaded facts in the light most favorable to the plaintiff, this does not discharge the plaintiffs burden to provide the factual information and context necessary to evaluate his complaint. See, e.g., Burgis v. N.Y.C. Dep’t of Sanitation, 798 F.3d 63, 70 (2d Cir.2015); McTigue v. City of Chi., 60 F.3d 381, 383 (7th Cir.1995) (statistics without context are “insufficient to satisfy even the loose requirements of notice pleading”); cf. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 312, 97 S.Ct. 2736, 2744, 53 L.Ed.2d 768 (1977) (“Statistics ... come in infinite variety.... Their usefulness depends on all of the surrounding facts and circumstances.”) (brackets omitted) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 340, 97 S.Ct. 1843, 1856-57, 52 L.Ed.2d 396 (1977)).
Relatedly, the complaint alleges that it is even more plausible that the Executive Defendants were deliberately indifferent to the danger to Hinojosa because he shared some medical characteristics with prisoners who had already died of heat stroke. But the story here is mixed. The complaint alleges that only four of the 14 decedents (including Hinojosa) were hypertensive and that three of the 14 were diabetic.[14] Ten of the 14 (including Hino-josa) were prescribed a psychotropic drug and three of the 14 (not including Hinojo-sa) were prescribed a diuretic. The ages of those who died ranged from 36 to 62, but Hinojosa was among the youngest at 44. The places of death vary, too, including the Coffield Unit and Mitchell Units in Tennessee Colony (300 miles away from Garza West), several TDCJ locations in Huntsville (over 250 miles away), the Hodge Unit in Rusk (over 300 miles away), the Hutchins State Jail in Dallas (over 300 miles away), and the Connally Unit in Kenedy (30 miles away). In short, no clear picture emerges from the profiles of the men who had already died. Consequently, it is hardly plausible to draw the inference of the Executive Defendants’ deliberate indifference to a prisoner in Hino-josa’s position at Garza West.
*688 The fact that TDCJ had been sued previously, and generally unsuccessfully, by inmates complaining of extreme temperatures does not create plausible inferences against these defendants. We have held in a similar context that the assertions in pleadings are “not ... particularly strong evidence” to show defendants’ knowledge. Ball, 792 F.3d at 595. Furthermore, the cases the plaintiff discusses in the complaint are all distinguishable. In Valigura, a lawsuit involving Garza East, this court indeed said that “temperatures into the nineties and hundreds are allegations that are sufficiently serious to” violate the Eighth Amendment. Valigura v. Mendoza, 265 Fed.Appx. 232, 236 (5th Cir.2008) (per curiam). A jury, however, apparently disagreed that those conditions existed at Garza East and rendered a complete defense verdict after a two-day trial. See Jury Verdict at 1, Valigura v. Mendoza, No. 2:05-CV-513 (S.D. Tex. Aug. 19, 2008). Livingston himself was dismissed as a defendant in Blackmon v. Kukua because the district court found he had no knowledge of the extreme temperatures that were complained of. 758 F.Supp.2d 398, 411 (S.D.Tex.2010). In Ruiz, a decision reversed by this court, there is only a passing mention of expert testimony that heat was a danger. Ruiz v. Johnson, 37 F.Supp.2d 855, 904 (S.D.Tex.1999), rev’d and remanded sub nom., Ruiz v. United States, 243 F.3d 941 (5th Cir.2001).
The remaining factual allegations fail to nudge this complaint toward plausibility. The fact that TDCJ policies recognized the risk of heat stroke does not mean that the Executive Defendants were deliberately indifferent to heat levels in the prisons. Cooling measures approved for TDCJ’s swine herd add a melodramatic flair but are irrelevant to human inmates’ conditions of confinement. And a letter from a single state representative “expressing concern” about high temperatures does not lead to an inference of knowledge, either. The complaint quotes from the letter that temperatures inside prison cells “do not fall below 100 degrees at night,” but his charge is flatly contradicted by the plaintiff’s own pleadings.[15] A letter containing dubious facts and otherwise just “expressing ... concern” over prison conditions is too weak to support the proposition that unconstitutional conditions were such a pervasive problem that the Executive Defendants had actual notice of the substantial risk to Hinojosa.
Finally, the majority, perhaps recognizing the complaint’s deficiencies, throw their hands up in the air: “In any event, the open and obvious nature of the dangerously hot conditions would also support an inference of deliberate indifference.” This is ordinarily the language of negligence, not deliberate indifference. A cognizable Eighth Amendment claim arises only if the Executive Defendants acted unreasonably in the face of “open and obvious” conditions. Cf. Farmer, 511 U.S. at 843-44, 114 S.Ct. at 1982-83. And reasonable measures, even if ultimately inadequate to prevent the injury, do not support a finding of deliberate indifference. See Johnson, 385 F.3d at 526. As I explained in the discussion of qualified immunity, the plaintiff’s own pleadings acknowledge that reasonable measures had been taken to prevent heat-related injuries: prisoners at Garza West could not perform outdoor labor before they had intake physicals; prisoners vulnerable to heat could not labor outdoors or engage in recreation before they had intake physicals; management of prison health measures was delegated to the professional medical oversight of the UTMB-Galveston; and extra water (though alleg *689 edly in inadequate quantities) was prescribed during hot conditions.
When a court evaluates the legal sufficiency of a complaint, it reviews the allegations holistically, as alleged facts are all judicial admissions. See Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ., 579 F.3d 546, 550 (5th Cir.2009). The facts pled here should preclude a deliberate indifference claim against the Executive Defendants because the complaint includes reasonable policy measures to avert the very injury suffered by Hinojosa. See Brauner, 793 F.3d at 499, 502 (holding there was no deliberate indifference on the part of prison officials where the plaintiff’s own pleadings were “replete with examples of attentive and varied treatment from his physicians” and “supervisory diligence” on the part of the assistant warden).
A final irony proves the injustice of footing this claim on broad allegations about the Executive Defendants’ (a) knowledge of “open and obvious” dangers from excessive heat in the prisons and (b) failure to implement more policies and training. The majority is allowing potential liability on a more lenient basis than would be required for the actual treatment Hinojosa received at Garza West. In an inmate suicide case, this court granted qualified immunity to the treating physician while carefully noting the critical difference between medical malpractice and Eighth Amendment deliberate indifference:
Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir.1985). Rather, the plaintiff must show that the officials “refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.” Id. Furthermore, the decision whether to provide additional treatment “is a classic example of a matter for medical judgment.” Estelle [v. Gamble, 429 U.S. 97, 107, 97 S.Ct. 285, 293, 50 L.Ed.2d 251 (1976).]
Domino, 239 F.3d at 756.
How can it be that the standards for imposing liability on the Executive Defendants have become, in the majority’s eyes, easier to meet than those for imposing liability on the medical staff or duty guards? Especially after Iqbal, the plaintiff has not provided the careful factual allegations to meet the burden of pleading, with plausibility, that three of the highest-ranking officials in the Texas prison system were deliberately indifferent to Hino-josa’s vulnerability to heat in the conditions he faced at Garza West.
I dissent.

. Hinojosa's complaint alleges that between 2007 and 2012, 13 TDCJ prisoners died of heat stroke (prior to Hinojosa's own death). *676 During the period from 2001 to 2013, 326 prisoners died in TDCJ custody as a result of suicide — an average of approximately 25 deaths a year, more than eight times the average number of deaths per year alleged in this case (less than 3). See Margaret Noonan et ah, U.S. Dep’t of Justice, Mortality in Local Jails and State Prisons, 2000-2013 — Statistical Tables 25 tbl.25 (2015), available at http:// www.bj s .gov/content/pub/pdfimlj sp0013st.pdf.

. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

. Additionally, the majority opinion condones abusive discovery that has already amassed thousands of pages of documents, plus depositions against these defendants, rendering their ultimate exoneration a hollow victory. This discovery far exceeds the case at hand, as it covers a lengthy time frame and the entirety of the TDCJ prison system. Qualified immunity, after all, is "immunity from suit, and extends beyond just a defense to liability to include all aspects of civil litigation.” Jacquez v. Procunier, 801 F.2d 789, 791 (5th Cir.1986); see also Iqbal, 556 U.S. at 685, 129 S.Ct. at 1953 (“The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery.”) (internal quotation marks omitted).

. See also Ball, 792 F.3d at 600 (approving remedies including diversion of cool air from prison staff areas, allowing inmates to access air conditioning during specified times, plus cool daily showers, cold ice water, personal ice containers, and individual fans). Ball, however, cannot be a basis for rejecting qualified immunity, because that opinion was issued in 2015, three years and more after the events here in dispute.

. Another case says prison officials should take steps to "address the risks of high heat.” See Blackmon v. Garza, 484 Fed.Appx. 866, 872 (5th Cir.2012). But as an unpublished and non-precedential opinion, Blackmon supplies no clearly established law.

. The plaintiff frequently complains about the lack of air conditioning in Garza West. (See, e.g., Pl.’s Compl. at ¶ 35 ("Though extreme indoor temperatures at the Garza West Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Kennedy, Stephens, Thaler, and Livingston, has taken no steps to air condition prisoner housing areas at the Garza West Unit.”)). It is unlikely that such a remedy could be undertaken by the Executive Defendants without legislative approval due to the cost. In addition, to the extent this court’s precedents speak about more comprehensive heat remedies, they reject that air conditioning must be installed to ensure cool prisons. See Ball, 792 F.3d at 599; Blackmon, 484 Fed.Appx. at 872 n. 6.

. And this is "[a]ssuming for the sake of argument that a right can be 'clearly established’ by circuit precedent despite disagreement in the courts of appeals.” Barkes, 135 S.Ct. at 2045. Otherwise, any right "clearly established” in our case law must be compared against the pronouncements of other courts of appeals that have had occasion to consider hot temperatures in the prisons. See, e.g., Chandler v. Crosby, 379 F.3d 1278, 1297-98 (11th Cir.2004) (finding no constitutional violation where temperatures ranged from 80 to 95 degrees ("not unconstitutionally excessive”)' and the prison’s remedial measures were.a ventilation system, prison cells not in direct sunlight, prisoners not compelled to wear heavy clothing or perform laborious , tasks, and prisoners with access to running water and a drinking cup).

. See Pl.’s Compl. at ¶ 18 ("As each of the Defendants have long known and discussed internally at high-level TDCJ and UTMB leadership meetings well before 2012, temperatures this elevated cause the human body to shut down.”); id. at ¶ 94 ("Livingston, Thaler, [and] Stephens ... knew extreme temperatures can be deadly.”).

. See Pl.’s Compl. at ¶ 22 ("It was well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions, like diabetes or hypertension, or who take certain medications, like antipsychotics or diuretics, are much more vulnerable to extreme temperatures.”); id. at ¶ 37 ("Defendants TDCJ, Livingston, Thaler, [and] Stephens ... know many prisoners have medical conditions that make the extreme heat deadly.”); id. at ¶ 52 ("TDCJ and UTMB officials, including Livingston, Thaler, [and] Stephens ... know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury and death.”); id. at ¶ 67 ("To put it simply, TDCJ officials, such as ... Thaler, Stephens, ... and Livingston ... know that TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions and know that this failure endangers prisoners[.]”).

.See Pl.'s Compl. at ¶ 92 ("Livingston, Thaler, [and] Stephens ... knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers")/ id. at ¶ 93 ("Livingston, Thaler, [and] Stephens ... knew inmate living areas at the Garza West Unit were not air conditioned and that the apparent temperatures routinely skyrock- . eted during the hot Texas summers and routinely exceeded 90 degree indoors.”); id. at ¶ 97 ("Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90 [degrees] at all times during the summer months.”).

. This court’s injunctive cases relating to prison heat conditions involved, unlike this case, executive defendants' personal knowledge of the adverse conditions and dangers to particular prisoners. See, e.g., Ball, 792 F.3d at 594-95; Gates, 376 F.3d at 335.

. Statistics publicly available from the Justice Department indicate that between 2007 and 2012, almost 2,600 prisoners died while in TDCJ custody. Including Hinojosa's death, this means that 0.5% of Texas prisoner deaths during this time period resulted from heat stroke. See Noonan et al., supra note 2, at 25 tbl.25. As noted above, during the period from 2001 to 2013, 326 prisoners died in TDCJ custody as a result of suicide and 54 as a result of homicide — an average of approximately 25 and 4 deaths a year, respectively, more than the average number of deaths per year alleged in this case (less than 3). Yet, our precedents have emphasized that both suicide and violence are part of prison life. See Domino, 239 F.3d at 756 (suicide); Newton v. Black, 133 F.3d 301, 307 (5th Cir.1998) (violence). Presumably, this court would not allow a plaintiff to plead that the Executive Defendants were deliberately indifferent to a personal threat to them of homicide or suicide based solely on these comparatively more common occurrences.

. It has been estimated that during a recent period under study approximately 19.2% and 4.2% of the male population of the Texas prison system are afflicted with hypertension and diabetes, respectively. See Amy J. Harz-ke et al., Prevalence of Chronic Medical Conditions Among Inmates in the Texas Prison System, 87 J. Urb. Health 486, 491 tbl.l (2010).

. See Pl.’s Compl. at ¶ 139 ("Though it was late at night when Hinojosa suffered the heat stroke, the indoor heat index was still 92 degrees.”).